| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT**<br>**EASTERN DISTRICT OF NEW YORK**<br>------------------------------------------------------<br>In re:<br><br>Mendel Paneth<br>               Debtor | Chapter  13<br><br>Case No. 22-41414- nhl |
| **UNITED STATES BANKRUPTCY COURT**<br>**EASTERN DISTRICT OF NEW YORK**<br>  ------------------------------------------------------<br>In re:<br><br>**Mendel Paneth and Sarah Paneth**<br>**a/k/a Sury Paneth,**<br>               Plaintiffs,<br>               **v.**<br>**David Reiner**<br>**Joseph Reiner a/k/a Yossi Reiner**<br>**JCR Printing Inc.**<br>**Rabbi Moshe Bergman**<br>**Congregation Bnei Avrohom**<br>**Tele Go Inc**<br>**Baruch A. Boas, a/k/a Avi Boas**<br>**Chaim Kohn**<br>**Infinite Solutions NY Inc**<br>**Elliot Blumenthal**<br>**Rabbinical Court of Boro Park, Beis Din Beis**<br>**Yoseph**<br>**Rabbi Reuven Pinchas Alt**<br>**Rabbi Asher Landau**<br>**Mendel Reiner**<br>**Rabbi Gershon Spiegel**<br>**Bais Din of Mechon L'Hoyroa**<br>**Rabbi Yechiel Blum**<br>**Beth Din CRC**<br>   **a/k/a Beit Din of Hisachdus**<br>**Rabbi Mendel Silber**<br>**Rabbi Chaim Shlomo Iliovits**<br>**a/k/a Shlomo Chaim Iliovits**<br>**a/k/a Shloime Iliovits**<br>**a/k/a Chaim Iliovits**<br>**Congregation Galanta Oir Pnei Yehoshua**<br>**Rabbi Isaac Eichenstein**<br>**Yosef Freund**<br>             Defendants. | Adversary Case No. |

**ADVERSARY COMPLAINT AND**
**OBJECTION TO PROOFS OF CLAIM**
**NUMBERS 9 (DAVID REINER);**
**10 (KIDLINE ENTERPRISES INC.); AND**
**12 (YOSEF FREUND)**

Plaintiffs, Mendel Paneth ("Mendel") and Sarah Paneth, a/ka/ Sury Paneth ("Sury") through their undersigned counsel, complaining of the above-named Defendants, allege as follows:

## Contents

INTRODUCTION ................................................................................................................ 4

   The Brainchild ............................................................................................................. 4

   The Peonage Master Enterprise .................................................................................. 6

   The Kidline Scheme .................................................................................................... 8

   The Arbitration Scheme .............................................................................................. 9

   The Anti- Hundred/ Antitrust  Scheme ....................................................................... 9

   The Bankruptcy  Scheme .......................................................................................... 10

JURISDICTION AND VENUE ........................................................................................ 10

relevant times ................................................................................................................... 12

PREDICATE ...................................................................................................................... 12

PARTIES ............................................................................................................................ 13

   THE PATTERN OF UNLAWFUL RACKETEERING ACTIVITY ........................ 17

   The Kidline Scheme .................................................................................................. 17

      The JCR Printing Scam ........................................................................................ 17

      The Nadler Buyout ............................................................................................... 18

      The House Purchase Trap ..................................................................................... 19

      The House Renovation Trap ................................................................................. 20

      The Money-Laundering Scheme ........................................................................... 21

      The Lease Guaranty Scam .................................................................................... 22

      The Tele Go Trap is Set ........................................................................................ 23

      The Unauthorized Sale to Yoel Klein .................................................................. 23

   The Arbitration Scheme ............................................................................................ 24

      Initial, Good-Faith Arbitration ............................................................................. 24

      Reiner fails  to comply, and Bergman drags his feet. ......................................... 26

      Reiner creates FINANCIAL CHAOS ................................................................. 26

Reiner and Boas create BUSINESS CHAOS: preventing transfer of telephone provider ... 30

Reiner creates LEGAL CHAOS through his Bizarre collaboration with Tele Go OPPOSING Sury's Action on behalf of Kidline ..................................................................................... 34

Chaim Kohn and Infinite  Solutions NY, Inc help Reiner create PRIVACY CHAOS ......... 36

Yossi Reiner and JCR Printing Inc ............................................................................................ 38

Reiner creates financial chaos - AGAIN .................................................................................... 43

Mendel Seeks Religious Guidance as to Bergman's conduct. ............................................... 43

Elliot Blumenthal, Esq enables Reiner to deceive Judge Baily-Schiffman ......................... 45

Pressure to withdraw Appeal .................................................................................................... 48

Post-Decision Arbitration Proceedings .................................................................................... 49

Arbitration Round Two. ............................................................................................................. 50

The Anti-Hundred Antitrust  Scheme ..................................................................................... 53

The Bankruptcy  Scheme ............................................................................................................. 73

Count 1 ............................................................................................................................................ 78

(Violation of Sherman Act § § 1, 2) .......................................................................................... 78

¶Relevant Product Market and Geographic Market ............................................................... 79

Interstate Commerce ................................................................................................................... 81

Count 2 ............................................................................................................................................ 82

Violation of 18 U.S.C. § 1962 (c) ............................................................................................... 82

associated with Kidline Enterprises Inc, Enterprise ............................................................... 82

COUNT 3 ......................................................................................................................................... 84

Violation of 18 U.S.C. § 1962(c) ................................................................................................ 84

associated with Association-in-Fact enterprise) ..................................................................... 84

COUNT 4 ......................................................................................................................................... 86

Violation of 18 U.S.C. § 1962(c) ................................................................................................ 86

Religious Enterprise ..................................................................................................................... 86

COUNT 5 ......................................................................................................................................... 88

Violation of 18 U.S.C. § 1962(d) by conspiracy ...................................................................... 88

to violate 18 U.S.C. § 1962(c) .................................................................................................... 88

OBJECTION TO PROOF OF CLAIM NUMBER 9 (DAVID REINER); ..................................... 89

claim no. 10 (kidline enterprise inc and ................................................................................... 89

claim no. 12 by yosef freund ...................................................................................................... 89

(Recoupment Relief against the Defendants' Proofs of Claim) ............................................. 89

PRAYER FOR RELIEF .................................................................................................................... 90

## <u>INTRODUCTION</u>

1)      This is a modern-day saga of subjugation and peonage in the Hasidic ghetto of the New York City Metropolitan area.

### <u>THE BRAINCHILD</u>

2)       It began in the <u>fall of 2014</u> when a 31-year-old Hasidic School teacher,  graphic artist, and lover of history, trained in yeshivas in Belgium and Israel, decided on a new life-purpose: to lift Hasidic children out the dark ages and give them the ability to live in a modern Hasidic-based world with knowledge and skills available to non-Hasidic youth. He planned to accomplish this by creating a youth-oriented Yiddish comic book.

3)      Because this vision and its scale and scope had never before been implemented, he decided that he needed to find an investor to provide him with seed money to get this project going. Inquiries in his "community" led him to one Eli Nadler ("Nadler") to facilitate this search.

4)      Nadler introduced Mendel to David Reiner ("Reiner"), whom Nadler described as a wealthy businessman with money to invest.

5)      Reiner expressed interest in the concept, but not as a lender, only as a partner.

6)      Mendel, inexperienced in business, asked Nadler for a recommendation of someone who could prepare an agreement between himself and Reiner, in Yiddish, Mendel's native tongue.

7)      Nadler, after speaking with Reiner, complied, recommending Joel Katz, someone whom Nadler explained was a former yeshiva classmate of Reiner's who would be the best person to perform this service.

8)      Communicating largely through Nadler (who served as intermediary for both Mendel and Reiner in the drafting process),  Katz, acting mutually, on behalf of the three

individuals, drafted a "Partnership Agreement" typed in Hebrew which was circulated, to Mendel, Nadler and Reiner. The Agreement provided for three partners: Reiner (45%); Mendel (45%) Nadler (10%). The three gathered on <u>October 24, 2014,</u> when, after Reiner penned in two additional changes, the three parties signed the agreement

9)     The Partnership Agreement included the following provisions:

Duty of Loyalty (¶14)

Equal access to passwords (¶16)

All checks must be signed by both Paneth and Reiner (¶19)

Unanimous consent to bring in new partners (¶¶20, 22)

All business must be conducted legally (¶21)

Absent consent of both Mendel and Reiner, he company must always have at least $100,000 in its bank account for current business expenses, and distribution of profits were conditional upon that requirement (¶25).

Before profits are distributed, Reiner is to be repaid his $150,000 investment, Mendel shall be entitled to the next $150,000 of profits on account of his the-current share of profits and as an advance against his future share of profits, such that profits are cumulatively in proportion to ownership shares. (¶26)

Covenant not to compete <u>for 3 years after "either of the partners exits the partnership in any way"</u> [1](¶27)

Mendel's Employment commitment: 5 years from execution of agreement (¶29)

If any partner wishes to sell or transfer all or part of their interest to a third-party, the other partner has a right of first refusal (¶31)

No transfer can occur without the written consent of the other partner (¶¶20,31)

If Reiner wishes to sell all or part of his shares, Mendel has the right of first refusal (¶33)

If Nadler wants to sell his 10% share, it must be <u>equally divided</u> between Mendel and Reiner: 5% each, even if one person shall pay more than half. (¶33)

---

[1] This provision became a heated issue in February of 2021, when Mendel set out on his own. *See* Anti-Hundred/Antitrust Scheme, below.

Prohibition of Kickbacks (¶39)

10)     On <u>October 29, 2014</u> Kidline Enterprises, Inc was formed with the NYS Secretary of State and Mendel became Editor-in-Chief

11)     By Operation of Law, the formation of Kidline Enterprises Inc, voided the pre-existing Partnership Agreement, and the relationship between the parties to that agreement was superseded by the statutory default relationship established by the New York Business Corporation Law.[2]

### THE PEONAGE MASTER ENTERPRISE

12)     Commencing with the execution of the Partnership Agreement, and continuing to the present date, the "**Peonage Master Enterprise**" was an Enterprise, designed and implemented by Reiner, with help from others identified below, the **First Objective of which was to subjugate Mendel**, and turn him into a peon, indentured to Reiner for the rest of his life. This Peonage Enterprise is divided into **four integrated components** set forth below, all designed to further the primary objective of subjugation of Mendel by Reiner, to bring Reiner lifelong income derived solely from Mendel's efforts, without any substantial effort by Reiner, and to place Mendel in a position of "<u>no possible escape</u>" if he wished to continue working in the industry of publishing Yiddish reading material for children.

13)     The **secondary objective of the Peonage Master Enterprise**, should Mendel choose to exit the relationship, **was to create pure punishment** (for the sake of punishment)  to Mendel and his family as the consequence of his exiting the relationship, in a fashion that would

---

[2] Any reference to the "Partnership Agreement" herein does not constitute an admission that the Partnership Agreement was valid and binding or that it was not superseded by the default provisions of the New York Business Corporation Law, nor a waiver of the rights derived from the legal position set forth in this paragraph

make it extremely difficult for Mendel to support his family; create financial hardship; emotional distress and consequential physical illness to Mendel and to his family.

14)    The following clauses of the Partnership Agreement were the initial indicators of Reiner's intent to subjugate Mendel, effectively nullifying the provisions which allow Mendel to leave the business **after working for five years**, or to set up a **competing business three years after ceasing to be a Kidline shareholder**.

15)    The Partnership Agreement provides at ¶3

> *The term of the partnership, throughout all its provisions, rights and obligations commence when this agreement is executed and thereafter, for an <u>unlimited period of time</u>. (emphasis added)*

The Partnership Agreement provides at ¶ 4:
> *It has been discussed among the parties that the partnership is <u>not limited to the aforementioned business name/periodical</u>; rather, this partnership agreement addresses and shall relate to any name or DBA of the business; the same applies if the periodical name shall change over the course of time. (emphasis added)*

The Partnership Agreement provides at ¶6
> *The business will engage in anything that involves <u>the business of publishing reading material for youth</u>. Over the course of time, they will examine and search how to expand the business and to profit in other ways too, to come up with additional and other manners off which to profit that are similar to the above. However, the business shall not engage in any other line of business that is not similar at all to the above, unless it will be decided upon through the written consent of the parties. (emphasis added)*

The partnership Agreement provides at ¶28:
> *It is expressly agreed to and stipulated that cannot (sic) <u>no type of dissolution can be compelled,</u> even though a majority. In the event anyone wishes to separate from the partner against the wishes of any party, and they cannot reach agreement, they shall go before a third party who is acceptable to all parties, and as he says so shall be done.*

16)    Implementation of the **Peonage Master Enterprise** has, in fact, created the consequences intended by Reiner—involuntary servitude of Mendel.

### *THE KIDLINE SCHEME*

17)    The publication of the first issue of Kindline[3] Magazine in December of 2014,

commenced a <u>five-and a half-year period</u> of Mendel's <u>subjugation by Reiner</u>, during which the

24/7 tireless work of Mendel and his wife Sarah ("Sury")[4], who served as bookkeeper and office

manager [5], transformed Kidline Enterprises, Inc. ("Kidline") publisher of Kindline Magazine

("Kindline") from a mere vision in Mendel's mind, to a wildly-successful business which

became a goldmine for all. By 2019, this business generated a profit of almost $500,000 per year,

allowing Reiner to receive full repayment of his investment within the first year, plus his share of

the annual profit, and allowing Mendel and Sury to live a very comfortable life.

18)    During this period, Reiner actively engaged in a protracted campaign of

domination, acting like an abusive spouse, mentally driving Mendel (and later, Sury) out of the

role as co-equal partner and into a state of subservience, "The Kidline Scheme", being the first

stage of the Peonage Enterprise.

19)    During this period Reiner violated with impunity the terms of the October 24,

2014 Partnership Agreement[6]:

> (i)  Taking majority control of Kidline by purchasing for himself the 10% share of
>      a third partner,  instead of maintaining equality in ownership as required by
>      the Partnership Agreement;
> (ii)  Opening corporate bank accounts with Reiner as sole signatory;
> (iii)Treating Mendel as an employee, rather than a partner;

---

[3] "Kidline" in English; "Kindline" in Yiddish.

[4] Sury initially served as an employee only: acting as bookkeeper and office manager. At a later time, either in 2016, or at the latest, September 2017, at the suggestion of Reiner's agent Yosef Freund, who arranged mortgages, Mendel, who did not use credit cards and thus had no credit record,  transferred his stock to Sury, to support the Paneth's anticipated mortgage application. At that time, in addition to being a  shareholder, Sury became Secretary of the Corporation.

[5] without any compensable services by Reiner, who merely signed checks, authorized wires, and attended periodic meetings.

[6] As indicated in footnote 2, there is no concession that the Partnership Agreement survives, and no recovery is sought herein for breach of the Partnership, but rather it is asserted that Reiner's conduct in derogation of the Agreement was part of the Peonage Enterprise, and its Enterprises.

(iv) Diverting corporate funds for personal benefit by engaging in money-laundering to receive untaxed income and thereby creating risk to the company and its shareholders,

(v) Upon repayment of Reiner's initial $150,000 investment, depriving Mendel of the agreed next $150,000 in profits by compelling Sury to treat that $150,000 as a loan from Kidline, towards the purchase of their home.

(vi) Violating the agreement provision mandating the maintenance of $100,000 minimum working capital at all times;

(vii)    Violating his duty of loyalty to the company by mandating that Kidline contract with his brother to print the magazine, who then secretly subcontracted the work to another company and then charged Kidline highly inflated prices.;

(viii)   Likely violating the provision specifically prohibiting kickbacks, if it is determined that he received from his brother a portion of the inflated printing charges which Kidline paid to Reiner's brother.

(ix) Transferring a portion of his shares to his friend, Yoel Klein, a third-party, without required unanimous shareholder consent.

### THE ARBITRATION SCHEME

20)    When Mendel sought the outside assistance of a Rabbinic Arbitrator, Reiner co-opted the Arbitrator into his service to wage a war of attrition against Mendel, **a second Scheme,** the Arbitration Scheme. During those Arbitration proceedings Reiner:

(i)    failed to comply with the directions of the Arbitrator to implement a partnership buy-out,

(ii) engaged in a concerted effort to interfere with the normal daily operation of the business; and

(iii) converted the Arbitration into a corrupt Scheme (the "Arbitration Scheme"), the purpose of which was to enable Reiner to take full control of Kidline without paying Mendel for his half.

### THE ANTI- HUNDRED/ANTITRUST SCHEME

21)    When Mendel left Kidline  to start out on his own company, under the auspices of a solely-owned company, Hundred Publications, LLC ("Hundred"), which published a Yiddish magazine ("Hundred Magazine")  Reiner created a **third Scheme** ("The Anti-Hundred/Antitrust Scheme") , enlisting the active assistance of a number of Beis Din (Jewish Courts) and other individuals, the purpose of which was  to prevent Mendel's new venture from entering the market and causing it to fail.

22)     After more than a year of such conduct, Reiner succeeded in accomplishing that goal.

### THE BANKRUPTCY SCHEME

23)     When, after Hundred ceased publication of its magazine, Mendel filed for personal reorganization, to create breathing time and space for him to earn a living, Reiner created a **fourth Scheme** ("The Bankruptcy Scheme") designed to prevent Mendel from  (i) engaging in the Yiddish children's magazine industry and (ii) supporting his family.

## JURISDICTION AND VENUE

24)      This Court has subject matter jurisdiction over Mendel's federal claims pursuant to 28 U.S.C. §§ 1331 (federal question),1334 (bankruptcy jurisdiction), 2201(a), 18 U.S.C. § § 1964(a)(Equity),  1964(c) (right to sue and treble damages),  15 U.S.C. § 15 (right to sue for violation of antitrust injury), and  18 U.S.C. § 1595 (private relief for victim of peonage, involuntary servitude).

(i)   Jurisdiction is also vested owing to 28 U.S.C § 1345 [by virtue of reference under 28 U.S.C.§ 157(a). This Court has supplemental jurisdiction over Mendel's state law claims for relief pursuant to 28 U.S.C. § 1367, as those claims are substantially related to the federal RICO claims and arise from a common nucleus of operative facts, and thus they form part of the same case or controversy under Article III of the United States Constitution.

(ii) The Court has subject matter jurisdiction under Section 4 of the Sherman Act (15 U.S.C. § 4 ) and under 28 U.S.C. §§ 1331 and 1337 to prevent and restrain Reiner and his entities and associates in fact from continuing to violate Section 1  and 2 of the Sherman Act (15 U.S.C. § § 1, 2 ).

(iii) The bankruptcy jurisdiction is vested owing to 28 U.S.C. §1334 and also section 157 providing core jurisdiction dealing with allowance and disallowance of claim against the estate and thus, this adversary proceeding arises under Title 11 and arises in and is related to the chapter 11 case pending in this Court.

(iv) This Court further has personal jurisdiction over defendants under 28 U.S.C. § 1965(b) because in any action brought pursuant to the Federal RICO statute in a U.S. District Court, that Court may cause parties residing in another district to be summoned to that district if the "ends of justice require" it. Given these facts, and that no other district has personal jurisdiction over all defendants, the ends of justice require this Court's exercise of personal jurisdiction over the defendants.

(v) This Court has personal jurisdiction over the defendants because the defendants have purposefully directed their conduct at this forum with respect to the unlawful funding and collection of the debt and as well obtained liens on the plaintiff's properties.

(vi) Venue is proper in this District and before this Court pursuant to 28 U.S.C. § 1391(b)(2) because events giving rise to Mendel claims occurred in the Eastern District of New York.

(vii) Venue is also proper under 18 U.S.C. § 1965(a) because Defendants transact their affairs in this district. Venue is further proper in this District pursuant to 18 U.S.C. § 1965(a) because each defendant is found and/or transacts his affairs in this District given each defendant's participation in the

alleged Association-in fact-Enterprise and as well as the Kings County
Supreme Court Enterprise, as alleged below.

(viii)   Venue is proper in this judicial district under Section 12 of the Clayton Act
(15 U.S.C. § 22) and under 28 U.S.C. § 1391(c) because the Count 1
defendants transact business and are found here.

(ix) Venue of this adversary proceeding is proper in this district under 28 U.S.C. §
1409.

(x) The Plaintiff consents to entry of final order or judgement by this Court. This
Court has subject matter jurisdiction over Mendel federal claims pursuant to
28 U.S.C. §§ 1331, 2201(a), 18 U.S.C. § 1964(c) and 18 U.S.C § 1595.

## RELEVANT TIMES

25)    The relevant times to this Complaint are from on or about October 24, 2014

through and  when Mendel sought bankruptcy protection and continuing to the filing of this

Complaint.

## PREDICATE

26)    This Complaint alleges, inter alia, violations under The Organized Crime Control

Act of 1970, Pub. L. No. 91-452, Section 901(a), 84 Stat. 941, Racketeer Influenced and Corrupt

Organizations ("RICO") and violations of 18 U.S.C. § 1961, et seq. and more specifically18

U.S.C. § 1581-1592, 1341, 1343, 1344, 103)(data theft)  et seq.  and is brought by the Plaintiffs

in connection with a scheme devised, conducted, and/or participated in by Defendants David

Reiner, Joseph Reiner a/k/a Yossi Reiner,  JCR Printing Inc., Rabbi Moshe Bergman,

Congregation Bnei Avrohom , Tele Go Inc.; Baruch A. Boas a/k/a Avi Boas; Chaim Kohn;

Infinite Solutions NY Inc.; Elliot Blumenthal; Rabbinical Court of Boro Park, Beis Din Beis Yoseph; Rabbi Reuven Pinchas Alt; Rabbi Asher Landau; Mendel Reiner; Rabbi Gershon Spiegel; Bais Din of Mechon L'Hoyroa;  Rabbi Yechiel Blum; Beth Din CRC a/k/a Beit Din of Hisachdus; Rabbi Mendel Silber; Rabbi Chaim Shlomo Iliovits, a/k/a Shlomo Chaim Iliovits, a/k/a Shloime Iliovits, a/k/a Chaim Iliovits; Congregation Galanta Oir Pnei Yehoshua; Rabbi Isaac Eichenstein and Yosef Freund,  each of whom was employed by or associated with the Association in Fact Enterprise to conduct or participate, directly or indirectly, in the conduct of the affairs of  the Association-in-Fact enterprise  through a pattern of racketeering activity, and to conspire to do so, and to wrongfully and unlawfully subjected Plaintiffs to Peonage and systematically looted whatever Mendel had built in his business and also then systematically put Mendel's company out of business and resulting in ex-communications from the Hasidic community.

27)      The Complaint also alleged\s (1) violation of Sherman Act, 15 U.S.C. §§ 1 and 2.

28)      The relief sought includes actual damages, punitive damages and treble damages arising from the scheme to reduce citizens of the United States to peonage and exploit them and cause their effective ex-communication socially and financially and placing them in involuntary servitude. Relief is also sought for restrictions on future conduct, an accounting, costs of investigation and suit, moratory interest and attorney's fees.

## PARTIES

29)      **Mendel Paneth**, a resident of Richmond County is an Educator, Historian, and Graphic Designer. Born in Belgium to a Hasidic family, his first language is Yiddish. He has a speaking knowledge of several languages, including Dutch, Hebrew and English. However, he is unable to read or write in English, other than on a rudimentary basis

30)    **Sarah Paneth**, wife of Mendel Paneth (a/k/a Sury Paneth, and while working at Kidline, used her maiden name Sury Friedman) , a resident of Richmond County, is a bookkeeper by trade and a homemaker for five children.

31)    **David Reiner** is a resident of Kings County.

32)    **Talmud Torah Ohr Moshe** is, upon information and belief, a New York Religious Corporation with its principal place of business in Kings County.

33)    **Joseph Reiner, a/k/a Yossi Reiner/**brother of David Reiner,  is a resident of Kings County .

34)    **JCR Printing Inc** is a New York Corporation**,** of which Joseph Reiner is the principal shareholder, with its principal place of business in Kings County.

35)    **Rabbi Moshe Bergman** is a resident of Kings County

36)    **Congregation Bnei Avrohom** is, upon information and belief, a is a New York Religious Corporation with its principal place of business in Kings County New York, of which Rabbi Bergman is the religious leader and under whose auspices Rabbi Bergman conducts business as Religious Arbitrator

37)    **Tele Go Inc.** is a New York Corporation with it principal place of business located in Kings County.

38)    **Baruch A. Boas a/k/a Avi Boas**  is  a resident of Kings County and an employee of Abaline Paper Products, Inc,  in Bayonne, NJ, a company in which, upon information and belief,  David Reiner's father-in-law is the owner, and, upon information and belief, David Reiner maintains an office and an email address.

39)    **Chaim Kohn** is a resident of Kings County

40) **Infinite Solutions NY Inc** is a New York Corporations with its principal place of business located in Kings County, of which Chaim Kohn is the principal shareholder.

41) **Elliot Blumenthal** is an attorney, licensed in the State of New York, with an office located in Nassau County, who has filed appearances and documents in New York State Courts representing defendants Tele Go, Inc, Joseph Reiner, JCR Printing Inc, Chaim Kohn, and Infinite Solutions NY Inc, all of whom were sued by or on behalf of Kidline Enterprises Inc.

42) **Rabbinical Court of Boro Park, Beis Din Beis Yoseph** is, upon information and belief a New York Religious Corporation with its principal place of business in Kings County

43) **Rabbi Reuven Pinchas Alt** is a resident of Kings County and serves as chief rabbi of Rabbinical Court of Boro Park, Beis Din Beis Yoseph

44) **Rabbi Asher Landau** is a resident of Kings County and serves as Secretary of Rabbinical Court of Boro Park, Beis Din Beis Yoseph.

45) **Mendel Reiner** (a/k/a Mendy Reiner), brother of David Reiner is a resident of Kings county

46) **Renewal of Life, Inc, d/b/a Renewal** is a New York corporation with its principal place of business located in Kings County from whose offices Mendy Reiner conducted business relevant to the within action.

47) **Rabbi Gershon Spiegel** is a resident of Ocean County, New Jersey who (i) served as Religious Advisor to David Reiner in the Arbitration with Rabbi Bergman; (ii) appeared in the Tel Go litigation as purported legal counsel to Reiner, and (iii) participated in Hundred-Related Arbitration proceedings with Rabbi Eichenstein, as Reiner's designated Rabbinical co-Arbitrator[7].

---

[7] Rabbi Eichenstein was the principal Arbitrator, and each party had designed a co-Arbitrator, Mendel's designated co-Arbitrator was Rabbi Koenig, for a total of three.

48)    **Bais Din of Mechon L'Hoyroa** is, upon information and belief, a New York Religious Corporation with its principal place of business located in Rockland County.

49)    **Rabbi Yechiel Blum** is a resident of Rockland County and serves as Secretary of Bais Din of Mechon L'Hoyroa

50)    **Beth Din CRC, a/k/a Beit Din of Hisachdus,** is, upon information and belief,  a New York Religious Corporation with its principal place of business located in Kings County.

51)    **Rabbi Mendel Silber** is a resident of Kings County and serves as Chief Rabbi of Beth Din CRC.

52)    **Rabbi  Chaim Shlomo Iliovits** is a resident of Kings County and serves as Secretary of  Beth Din CRC

53)    **Congregation Galanta Oir Pnei Yehoshua** is, upon information and belief,  a New York Religious Corporation with its principal place of business located in Kings  County.

54)    **Rabbi Isaac Eichenstein**  is a resident of Kings County and serves as Rabbi of Congregation Galanta Oir Pnei Yehoshua.

55)    **Yosef Freund** is a resident of Kings County

56)    **Congregation Teferes Moshe** is a New York Religious Corporation with its principal place of business located in Kings County, through which Yosef Freund conducts business. and has conducted business relevant to the plaintiffs in this action.

57)    **Moshe Friedman**  ("Friedman") is a resident of Kings County who currently serves as Editor-in-Chief of Kindline Magazine.

### *THE PATTERN OF UNLAWFUL RACKETEERING ACTIVITY*

### *THE KIDLINE SCHEME*

58)     From the very beginning Reiner acted as if he was the sole owner of the company and Mendel was subservient. He failed to provide Mendel with a stock certificate or copies of any corporate formation documents. He unilaterally designated himself President and did not provide for any other officers. He opened a bank account for Kidline at JPMorgan Chase without Mendel's presence. He established himself as the sole signature on that bank account. He advised Mendel that he would remain sole signatory until Reiner's $150,000 investment was repaid. Although the investment was repaid within approximately one year, Reiner refused to add Mendel as a signatory on the bank account. When Sury became a shareholder in lieu of Mendel, Reiner refused to allow her to sign checks, and all times Reiner remained sole signatory on the Chase checking account and the Chase corporate credit card. He regularly gave Mendel orders as if he was a child.

#### *The JCR Printing Scam*

59)     <u>In early 2015,</u> Reiner insisted that the company switch printers for the magazine and hire JCR Printing, Inc, owned by his brother  Joseph ("Yossi") Reiner, as the exclusive printer of Kindline Magazine. Reiner falsely represented that JCR had experience with this type of work. Mendel privately inquired about JCR and learned it was a small company whose printing jobs were often wedding invitations. He expressed his reluctance to Reiner, but Reiner's insistence prevailed, and JCR was hired.

60)     Five and one-half years later, during the course of tumultuous Rabbinic Arbitration, during which Reiner had created chaos by arbitrarily refusing to approve payment of ordinary course business expenses, and had prevented the transfer of telephone service to a superior supplier, Mendel and Sury became concerned that Reiner could also interfere with the

printing of their magazine, which was controlled by Reiner's brother Yossi, through JCR..

Accordingly, Sury started researching alternative printers. The first company she called, Fry

Printing, disclosed to her that Fry was actually printing Kidline Magazine, through a subcontract

from JCR!  JCR had secretly outsourced the job to that company, which had been charging JCR

approximately one-third of the cost that JCR had billed Kidline for the entire period of

publication. Sury performed a detailed analysis comparing the rates charged by JCR to Kidline

with rates offered by two competitors. Based upon rates charged by Fry, the overbilling

amounted to $1,583,894.15. Compared to rates quoted by an Israeli printer,  the overbilling

amounted to $2,203,422.25

61)    Coercing Mendel to consent to the use of JCR, without competitive bidding was a

violation of the duty of Loyalty contained in the so-called "Partnership Agreement".

62)    Upon information and belief, Reiner received a share of JCR's profits from the

overcharging of Kidline.

63)    Receipt of any payment by Reiner from JCR or Yossi Reiner was a violation of

the specific provision in the Partnership Agreement prohibiting kickbacks, and under the

Agreement, receipt of kickbacks resulted in automatic expulsion from the company.


### *The Nadler Buyout*

64)    In March of 2016, Reiner **told** Mendel that he was buying  Nadler's 10% interest

in the corporation and ordered Mendel to sign papers to that effect without providing Mendel

with the opportunity to acquire half of that 10% (and to maintain equal ownership with Reiner,

as  required by the so-called "Partnership Agreement" of  October 24, 2014). At that time the

Kidline bank account had sufficient funds for the company to redeem Nadler's shares, thereby

retaining equality between Reiner and Mendel. Notwithstanding this, Reiner insisted upon

buying all of Nadler's shares personally, and in fact used a corporate check for $100,000 to pay

Nadler, until Reiner was able to raise his own funds, which he then repaid to the company.

Mendel was given no say in the matter, notwithstanding any writing to the contrary.


### *The House Purchase Trap*

65)    After acquiring majority control and recognizing the huge profits Mendel was

generating for Reiner (with essentially no work by Reiner), but cognizant of the animosity

developing,  Reiner engaged in a strategy to prevent Mendel from ever leaving the company.

This strategy was to financially bind Mendel to Kidline, by increasing his personal overhead to a

level that could not be maintained from any other income source that might be available to

Mendel.  Specifically, this was accomplished by Reiner's playing to the long-expressed desire of

Mendel and Sury to purchase a house of their own.

66)    In or about <u>February 2017</u> , Reiner  connected Mendel and Sury with his friend,

Yosuf Freund, and told Mendel and Sury that Freund was in the business of assisting people  in

obtaining house financing. It is not known if Freund was a NYS licensed mortgage broker, but

when Mendel and Sury found a house in Staten Island that met their needs, Freund helped them

qualify for a mortgage.

67)    When Freund learned that Mendel did not use credit cards, and thus did not have a

credit score, he suggested that Sury be the main applicant for the mortgage. Freund advised

Mendel and Sury that he would arrange with Reiner to have Mendel's stock in  Kidline

transferred to Sury. Reiner complied, and Freund procured the mortgage. They closed on the sale

on <u>May 24, 2017.</u>for a price of  $950,000 of which $636,000 was the mortgage and the balance

was paid with funds from Kidline

### *The House Renovation Trap*

68)     Although Mendel and Sury had planned only minimal renovations before they moved in, Reiner recommended that they make substantial renovations. Reiner told Mendel and Sury that Freund was arranging for a large loan to Kidline to fund Kidline renovations and an expansion of Kidline Magazine to add an English language edition and that from that loan, the house renovations could be covered. Pending that loan Reiner told Mendel that Freund would lend money for the renovation and Freund did so.

69)     The big Kidline loan never materialized. Mendel told Freund that he would be repaid from quarterly distributions of Kidline profits due to Sury (then shareholder in lieu of Mendel).  Reiner, upon learning of this from Freund, directed Sury, instead, to pay some of the money due to Freund from Kidline's bank account directly to Freund,  and some of the money by writing Kidline checks to "Congregation Tiferes Moshe" of which, upon information and belief, both Reiner and Freund are members. Sury complied. The records of these payments (both those directly paid to Freund, and those paid on Freund's account to Congregation Tiferes Moshe, are presently in the exclusive control of Reiner,  Freund, and Congregation Tiferes Moshe.

70)     The renovations were completed, and Freund arranged for a refinance of the Paneths' home for $937,500 to pay off the existing mortgage, to pay monies owed to contractors and repay Freund. On <u>August 21, 2018,</u>  the Paneths  closed on the new loan. Subsequent to the refinance, Reiner's loans to Mendel were fully paid. The big surprise that came with the new loan, however, was a very high interest rate of 6.5%. and it was a variable rate that made monthly mortgage payment, including taxes and insurance  **approximately $7,000 per month.** Suddenly, Mendel and Sury realized they were trapped!  They were both exclusively working for Kidline and  had no ability to get jobs outside of Kidline which would pay as much. Thus, in order to pay their personal living expenses, they realized, notwithstanding a history of difficulty

with Reiner, they both had to stay working with him. To make matters worse, it was the hard work of Mendel and Sury which was making Reiner rich, notwithstanding that Reiner performed no services to receive his share of the company's profits.

71)    Finally, in <u>January 2021</u>, Mendel and Sury refinanced the high-interest mortgage that Freund had arranged for them, for a new mortgage at 2.99% and their monthly mortgage payment went down to about $4,726.80.

### ***The Money-Laundering Scheme***

72)    After moving to Staten Island, due to long hours and hard work put into the company by her and the success of the company, Sury asked Reiner (because he controlled 55% of Kidline; and notwithstanding the she was then the 45% shareholder) if she could get a raise from her $1,000 weekly salary, and she suggested that the company directly pay certain business-related expenses for herself and Mendel, including auto lease and insurance and telephone bills.

73)    Although Reiner was technically a 55% shareholder of the company, receiving 55% of the company's profits, distributed quarterly, he was not performing any compensable services for Kidline and was not receiving a salary, nor was he entitled to one. Nevertheless, he responded to Sury "If you are going to take a raise, I am going to take a raise of $1,000 per week."

74)    Reiner told Sury that he did not want to go on payroll for this payment, but instead directed her to write checks to charitable organizations, which would deposit the Kidline checks and give Reiner back the cash. At Reiner's direction, Sury was periodically forced to write large checks to nominees designated by Reiner for the cumulative amount of these weekly accruals and Reiner signed the checks, which had the effect of draining the company of essential

working capital and driving it below the minimum $100,000 working capital as required in the original Partnership Agreement.[8]

75)      Talmud Torah Ohr Moshe was the principal organization that assisted Reiner and facilitated his implementation of this illegal plan, putting Kidline and all shareholders at risk.

76)      Reiner attempted to shelter himself from personal risk involved in this scheme by compelling Sury to sign all Kidline income tax returns for the years 2016 – 2019, denominating her as Secretary, although he had designated himself as President.

### *The Lease Guaranty Scam*

77)      On May 11, 2017, just before the closing on the purchase of their Staten Island home, Mendel and  Reiner were in the process of negotiating a lease for new premises for Kidline at 5309 18th Avenue, Brooklyn New York. Reiner, without Mendel's knowledge or consent, caused to be filed with the New York Secretary of State, a new, single-member LLC entitled "Kindline Enterprises LLC" whose sole member was Mendel.

78)      Reiner's sole purpose in forming this entity was to have the LLC (of which he was not a member)  to be the named tenant on the lease for Kidline's new offices. Knowing that the landlord would require a personal guarantee by all principals of the tenant, and desirous of avoiding signing such a personal guarantee himself, Reiner used this ruse to cause Mendel alone, to sign the personal guarantee.

79)      The landlord, not realizing the ruse, had the lease prepared in this new entity's name

---

[8]  Paragraph 25 "It is agreed between the parties to distribute the profits every quarter of the calendar year. It is further agreed tht they always leave the sum of hundred thousand dollars in the business account for cash flow purposes, with profits of above that sum only to be distributed."

80)    Reiner forced Mendel to sign the personal guarantee. Seeing no choice due to years of Reiner's domination and the imminent house closing, Mendel did sign it on <u>May 26, 2017</u>

81)    The lease was signed on <u>June 5, 2017</u> .


### *The Tele Go Trap is Set*

82)    <u>In November  2017,</u>  after the move to the new office, Reiner decided to change phone service  to a company named Tele Go, which he was using at his other business, Abaline Paper Products, Inc.  Instead of designating computer expert Mendel to be the system administrator or Sury, Reiner's  then-partner and Kidline's bookkeeper/office manager, Reiner secretly designated as "System Administrator" and "Authorized Contact" an individual named Avi Boas. Boas was <u>not a Kidline employee</u>, but rather Reiner's employee at Abaline Paper Products, Inc. <u>On December 15, 2017,</u>  Boas signed the Tele Go contract ***on behalf of Kidline***.

83)    On<u> June 13, 2019 </u>(a year before the events of  August of 2020), Sury started complaining to Reiner about the poor phone service provided by Tele Go and recommended a change.

84)    These problems persisted, and by <u>July of 2020,</u> had reached a breaking point, with the phone lines going dead, and being full of static, and voicemail not being saved.


### *The Unauthorized Sale to Yoel Klein*

85)    **In 2019**, after acquiring 55% ownership of Kidline, Reiner, without shareholder Sury's  knowledge or consent, transferred 20.75% of Kidline to Reiner's friend, Yoel Klein.

86)    This transfer was in violation of the initial understanding of the parties.

87)    In the two-year period between the <u>summer of  2018  and April of 2020</u> Reiner's

dictatorial conduct worsened.  In the beginning of 2020 Reiner's conduct became bizarre.

- He wrote excessive checks for his personal purposes from the company.
- This left insufficient funds to pay Kidline regular quarterly distributions.
- He refused to sign checks for regular operating expenses.
- At one time, to generate more personal income, Mendel considered opening a separate business in his own name to develop different concepts. When he notified Reiner of this intention, Reiner replied:  **"Every penny you make in any of your any other business you decide, 55% is mine."**


### *THE ARBITRATION SCHEME*
#### *Initial, Good-Faith Arbitration*

88)    Mendel, seeking to mend the increasing friction with Reiner, sought outside

assistance. He was referred to Rabbi Moshe Bergman of Congregation Bnei Avrohom, whom, he

had been advised, was  highly experienced Business Mediator to help parties resolve business

disputes.

89)    On <u>May 8, 2020,</u>  Mendel meet with Rabbi Bergman in his office at Congregation

Bnei Avrohom. Mendel

90)    Mendel explained to Rabbi Bergman that he was  having trouble working with his

business partner and was looking for a quick and relatively inexpensive rabbinic solution by a

single mediator, rather than a full-blown trial before a 3-rabbi court (Beis Din). Mendel

explained that he wanted to economically resolve the partnership dispute in a couple of sessions,

like marital therapy, so the two equal partners could learn to treat each other fairly for the sake of

the business.

91)    Rabbi Bergman said that he would comply with Mendel's request, and  he

scheduled two sessions.

92)    On <u>May 11, 2020,</u> Mendel and Reiner, without attorneys,  met with Rabbi Bergman. Mendel asked Rabbi Bergman, in Reiner's presence, if Kidline could pay for his services, rather than each party individually. Before the Rabbi could respond, Reiner refused, and said each party should pay their own expenses. Although this bothered Mendel, he accepted it, because he believed the Rabbi's promise that the Arbitration  could be finished this in a couple of sessions. Mendel then presented his case.

93)    On <u>May 12, 2020,</u> Reiner was given an opportunity to rebut Mendel's claim and present. any claims he had against Mendel. Rather than disputing any of the facts Mendel had presented the prior day to the Arbitrator, Reiner resorted to personal attacks against Mendel, talking about  his background and upbringing, family, and financial status.

94)    Bergman held a third and "final" session was held <u>May 14, 2020</u>. At the end of that session, Rabbi Bergman stated:

> *I see people coming to me for marriage and for business.*
> *Sometimes in the process of trying to fix it, it only gets worse.*
> *There is too  big of gap between the two parties here. Best would*
> *be to work on splitting rather than fixing the partnership.*

95)    After stating this to both parties, Bergman turned to Mendel and said: "You won! But you will have to split up."

96)    **Bergman then directed both parties to email to him names of business appraisers so he could select one to value the business.** He stated  that Mendel would have the first right to buy out Reiner, and that Mendel's purchase price would be reduced  by the value of Mendel's claims against Reiner.

97)     Mendel complied with Bergman's directive, immediately sought out the name of a business appraiser, and on <u>May 19,2020</u>  emailed the name and phone number to Rabbi Bergman.

### *Reiner fails  to comply, and Bergman drags his feet.*

98)    Starting on  May 21,2020,  Mendel exchanged text messages with Rabbi Bergman, seeking to move things along and asking for a status report as to whether Reiner had provided an appraiser. .At Bergman's request, Mendel  provided Reiner's phone number.

99)    Mendel, hearing nothing from Bergman continued texting to Bergman.  Mendel provided Bergman with his attorney's phone number . On June 1, 2020, Mendel emailed both Bergman and his attorney, Mr. Goldberg, requesting a status report.

100)    Rabbi Bergman did not respond to Mendel's  messages and did not take any action against Reiner for failing to comply with Bergman's directive.

101)    Notwithstanding Bergman's initial promise of a quick resolution and his decision that one partner should buy out the other,  Bergman scheduled and presided at **four additional Arbitration sessions** between June and September of 2020.

### *Reiner creates FINANCIAL CHAOS*

102)    On June 10, 2020 , Mendel advised his attorney, Israel Goldberg  that Reiner was putting the business in danger by locking Sury out of Kidline's bank accounts at JPMorgan Chase. As bookkeeper (and shareholder) Sury always had viewing rights to the account, so she could perform her job of managing the company's daily financial affairs and sending Reiner a list of financial transactions to approve. Reiner abruptly and unilaterally removed those rights. At that time the company account had over $200,000 in it, yet Reiner had refused to authorize payments by wire, ECF or check, of any current and ordinary operating expenses, including ordinary 1099 staff contractors.

103)    Upon advice of counsel, as an interim solution to this crisis, Mendel and Sury created alternative banking arrangements by re-opening a pre-existing Kidline bank account at

Northfield Bank, for which both Mendel and Reiner were authorized signatories, thereby

enabling Kidline to pay its bills and keep operating

104)    On <u>June 11, 2020,</u> Mendel continued the previous day's email thread **(see prior**

**Exhibit)** to his attorney Mr. Goldberg, but this, time copying Rabbi Bergman with the following

instructions: :

> *Please  tell the rabbi that so long I'm not owing [sic] that accounts [sic] together with him, And so long he have[sic] the power to lock me out/or pay/transfer money from the bank without me. I'm not ready to continue talking.*
>
> *With that action he is stealing money from me/business and holding me hostage. So I'm not talking and negotiating with terrorists.*
>
> *After I'm added to both accounts with the same power like him I'm' ready to continue.*
>
> *And if this bank situation is not done 100%, I will be forced to take some action to save the business and secure the wages of my staff and stand-up for my right that I was abused and violated the last 6 years.*
>
> *Terror will not be tolerated no more.*
>
> *Terror will be answered with action.*
>
> *I'm living six years in Terror and manipulation, and this is ain't going to be continued for no price in the world!"*

105)    Rabbi Bergman, at the end of the thread acknowledged receipt, indicating only

that  such correspondence should by copied to the other side as well, which it was.,

106)    On <u>June 12, 2020,</u>  Mendel's attorney, Mr. Goldberg  advised Rabbi Bergman

(with a copy to Reiner) of Reiner's interference in the business:

> *This letter is submitted to address an exigent circumstance that requires immediate attention to assure that the Kindline Enterprises (hereinafter Company) is able to continue in business*
>
> *As you are aware from the proceedings before you, Mr. Reiner has opened a Company account at Chase bank. Mr. Reiner, in violation*

> *of the written agreement with Mr. Paneth, is the sole signatory on the account. While in the past, information regarding the account has been made available to Mr. Paneth, Mr. Reiner, who is the sole signatory on the account, has acted to block Mr. Paneth's access to that account.*
>
> *The net result is that Mr. Reiner has total control over the Company's funds, receivables and payables. In place of transparency, as required under the agreement of the parties, Mr. Reiner has engineered a stranglehold on the business."*

To address Reiner's behavior, in violation of both the Arbitrator's original direction to provide the name of an Appraiser, and of Reiner's fiduciary duty to the corporation, attorney Goldberg requested an  Interim Order by the Arbitrator prohibiting Reiner from interfering with the business, or in the alternative, permission from the Arbitrator to make such a motion in Supreme Court.

107)    On June 15, 2020, in an exchange of text messages, between Mendel, his, attorney Israel Goldberg, David Reiner, and Rabbi Moshe Bergman Mendel requested that Kidline pay for the additional Arbitration sessions. Reiner replied:

> *Absolutely Not"… "Until you throw me out, I am 55% absolute boss.  If you didn't realize that until now June 15, 2020, 9:26 AM*

108)    Mendel responded in Yiddish:

> *Your "decision" of not wanting to pay it from the business. comes from the same tricks and cahoots of choking me privately.*
>
> *You have tricked me from the beginning and you "led me by the nose"*
>
> *From my private pocket I will not pay a penny June 15, 2020, 9:27 AM*
>
> *You are not 55% partner  You are a violent man*

109)    Rabbi Bergman, notwithstanding Mendel's clear statement that he could not afford to personally pay the costs of arbitration, failed to exercise his authority to compel the corporation to bear arbitration costs so as to establish equality between the partners.

110)     Rabbi Bergman neither said nor did anything about forcing Reiner's compliance with Bergman's directive to provide an appraiser nor about restoring access to the Chase accounts and approving payment of bills.

111)     When Reiner discovered that Mendel and Sury had restored order to the business by opening a separate Kidline account to pay normal operating expenses, thus circumventing the chaos created by Reiner,  Reiner sent Bergman an email accusing Mendel and Sury of diverting money from the business.

112)     **Upon receiving Reiner's accusation**s Bergman ended his silence; but instead of either (i) enforcing his directive that Reiner provide an appraiser, or (ii) directing Reiner to restore Sury's access to Chase, Bergman, contrary to the terms of his original retention and contrary to his own decision for one partner to buy-out the other**, ramped-up the Arbitration** .

113)     Bergman engaged with Reiner, in a process which was supportive of Reiner's goal: to drag-out and  increase the costs of Arbitration, turning the Arbitration proceedings into a war of attrition, which ultimately continued for almost two years. To start this process, Bergman scheduled four more sessions June 24, 2020, July 1, 2020, September 9, 2020, and September 10, 2020.

114)     On August 3, 2020, Sury emailed Reiner requesting approval of ordinary course transfers and payments. Reiner (repeating the maneuver which triggered Mendel's June 10, 2020, panicked email to his attorney, Mr. Goldberg)  refused the requested approvals. This caused Sury, on  August  4, 2020  to email  attorney Goldberg,  advising that Reiner is holding up function of business

115)    Meanwhile, Bergman did nothing to force Reiner to provide a business appraiser, as previous directed, or to proceed with the appraisal process using the Appraiser provided by Mendel

116)    Furthermore, Bergman did nothing to maintain the status-quo, such as directing Reiner to authorize payment of ordinary-course business expenses from the substantial funds then in the Chase account, which then had a balance, per QuickBooks of over $200,000

117)    Bergman directed that <u>both Mendel and Reiner</u> provide records of the transactions in the respective bank accounts. <u>Mendel complied</u> with the direction; <u>Reiner did not</u>. Bergman took no action against Reiner for his failure to comply.

### *<u>Reiner and Boas create BUSINESS CHAOS: preventing transfer of telephone provider</u>*

118)    In <u>July of 2020</u>, in the midst of Arbitration proceedings, Mendel was preparing to open a new "Publishing Museum" in Kidline's offices, for camp and school group tours, as a tool to enhance the reputation and the circulation of Kindline Magazine. During the period of advertising for this new museum, the Tele Go's phone service was performing at standard levels: Intermittently the lines went dead; the phones constantly had static, and voice mail was not working.

119)    For years Mendel and Sury had experienced increasing levels of exasperation with Kidline's telephone system, provided by Tele Go, Inc. As recited above, this system was provided by a company which Reiner had, in 2017, insisted upon because he was using it at Abaline Paper Products, Reiner's other company. Since the switch to Tele Go, as demanded by Reiner (supposedly to improve service and get a better price), Sury discovered that Tele Go's service was <u>not</u> less expensive, and the <u>quality of the service had been poor for years and was getting much worse.</u>

120)    To service the Ultra-Orthodox community, which did not allow use of the internet, the telephone was the main mode of conducting business

121)    Tele Go's service had been regularly experiencing the following problems:

(i)   Phone were constantly dropped.

(ii) Voice messages were not being saved.

(iii)The lines intermittently went dead.

(iv)The lines were full of static.

122)    Sury researched and identified an alternative provider with better rates and an excellent reputation, Telebroad, LLC. Her attempts to switch from Tele Go to Telebroad were blocked by Reiner and his agent Avi Boas of Reiner's other company,  Abaline Paper Products, Inc.  During the course of litigation commenced against Tele Go in 2020, it was discovered that , in 2017, at the time of Transfer of service to Tele Go, the Activation form had listed  Boas, of Abaline,  as both the System Administrator and Contact Person for Kidline

123)    When Tele Go's service started  in January of 2018 Sury discovered that invoices were going to Abaline. Sury contacted Tele Go and had  the invoice changed to her email as the billing address, rather than to Avi Boas at Abaline, so she could timely receive invoices and make payments. . At that time, once the Tele Go equipment was installed,  Sury had no knowledge that Boas had any further responsibilities regarding Kidline's telephone system.

124)    During the course of litigation, discussed below, it was first discovered that Boas (who was not an employee of Kidline)  had been established at inception as Kidline's the sole authorized contact person for Tele Go to discuss the account with, as well as the System Administrator. being the sole person with access to all the features of the phone system, and the sole person who could control access to the account.

125) Accordingly, when Sury (shareholder, bookkeeper, and office manager) contacted Tele Go in July of 2020 to cancel the Tele Go service and have Telebroad take over, Grace of Tele Go  emailed Reiner on August 5, 2020, to notify him of Sury's request to transfer the service and Reiner immediately responded,

> *"I will reject all port out requests"*

126) On August 11, 2020,  Grace of Tele Go sent Reiner another email, asking Reiner if he also would deny any request to change Administrator, and  **Avi Boas** (avi@abaline.com) (who was on the thread) immediately replied

> *Do not release any administrator privileges!!!!!!!!!!!!!).*

Simultaneously, **David Reiner replied**:

> *Please do not release any admin privileges unless you specifically speak to me:*

127) After much effort, Sury finally succeeded, on August 11, 2020.   in  transferring the service to Telebroad

128) On August 16, 2020, Tele Go's account executive, Shoshana,  notified Sury that Tele Go's contract with Kidline contract was set to expire on its own terms in six months**,** indicating that the cancellation would result in an early-termination fee about $4,278.45.

129) Reiner's interference with Sury's efforts to switch phone service created substantial operation problems for Kidline's business.

130) In the course of the switch to Telebroad, Telebroad's  technician asked Sury to let him speak with the back-end person serving as the administrator of the Tele Go account, who would know the login credentials. Neither Sury nor Mendel  had any idea that the system had an administrator. The technician expressed shock that neither of them had any access to the administrative controls.

131)    During subsequent litigation, Sury first learned that the  service, set up by Reiner's Abaline employee Avi Boas in <u>2017</u> included a feature that <u>automatically recorded all phone calls</u>,  thus it was discovered that  Avi Boas, and through him, David Reiner<u>, had the ability to listen to recordings of any phone call made on Kidline's system and any voice mail.</u>

132)    On <u>August 13, 2020,</u> after Sury had worked tirelessly to successfully transfer the service to Telebroad on <u>August 11, 2020</u>, for the sole purpose of making urgent service upgrades to prevent loss of business, Reiner again interfered and caused a REVERSAL of the prior transfer.

133)    Finally, and only after obtaining a <u>new phone number</u>, Sury was able to establish quality phone service with Telebroad. The damage to Kidline, caused by the actions of Reiner and Boas was:

(i)   Loss of existing customer base which was had used our old phone numbers
(ii)  Loss of new customers who called the old number
(iii) Loss of  a substantial portion of anticipated summer museum revenue,
(iv) Expenditure of  large sums invested in advertising the new number
(v)  Damage to the company's reputation due to the extreme confusion caused by the interruption in phone service.

134)    On <u>August 24, 2020</u>, due to Reiner's active interference with Sury's efforts to replace Tele Go phone service, and because of the negative impact that interference had upon Kidline's business, Sury, individually, and on behalf of Kidline, brought an action in Supreme Court, Kings County against Tele Go, Inc, under index No.515628/2020 , alleging, her Amended Complaint

*CA 1: tortious interference with business*

*CA 2: breach of duties and gross negligence by re-porting Kidline's phone numbers back to Tele Go after Kidline had successfully switched service to Telebroad; surreptitious recording*

*of phone conversations; negligently allowing voice mail to fill up, causing customer messages to not be recorded and damaging to Kidline's reputation, and entitling Kidline to recover attorney's fees*

*CA 3 loss of advertising revenue due to above breaches*

*CA 4 illegal recording and sharing of privileged information*

*CA 5 violation of privacy and injunction as to dissemination material and turnover*

### ***Reiner creates LEGAL CHAOS through his Bizarre collaboration with Tele Go OPPOSING Sury's Action on behalf of Kidline***

135)    In the action brought against Tele Go by Sury (individually and on behalf of Kidline), Reiner, <u>although not a party</u>, caused his attorney Israel Vider to  participate in the Tele Go case, purportedly on behalf of Kidline. Both Reiner and Vider

(i) Signed papers to <u>oppose the relief</u> sought by Plaintiff (to require Tele Go to port Kidline's phone number to Telebroad);

(ii) <u>Provided documents and information</u> to assist Tele Go <u>defend</u> the litigation brought by Sury;

(iii)<u>Moved to compel Rabbinic Arbitration</u> before Rabbi Bergman of the Tele Go porting issue,

(iv)<u>Moved to dismiss</u> Sury's action against Tele Go;

(v) <u>Moved to consolidate</u> into the Tele Go action, the Richmond County action later filed by Sury and Mendel against Reiner and Klein; and

(vi)<u>Moved to dismiss</u> both the Tele Go action and three additional Richmond County actions, despite the facts that  (a) Tele Go's poor service to Kidline was the cause of Sury's desire to switch service, (b) improving Kidline's phone service by the porting to Telebroad was the objective of the action against Tele Go;  (c) Tele Go had nothing to with the partnership dispute that was the basis of the Rabbinic Arbitration;  and (d) Tele Go had never signed an Arbitration Agreement with Rabbi Bergman

136)    Reiner provided the following documents used in opposition to the motion to compel porting or other relief:

(i) K-1's for Kidline showing that Sury only had a 45% ownership interest arguing that she  had no authority to bring the action.

(ii) Reiner's email thread with  Tele Go instructing them not to switch the provider or to change the system Administrator from Avi Boas to anyone else.

(iii)The <u>May 11, 2020</u>, Arbitration Agreement for Rabbinic Arbitration signed only by Reiner

137)    The Docket of the Tele Go litigation contains 121 filed documents  with Mr. Vider participating to the very end. Vider's  last filing was Document 118 filed on <u>April 12, 2021</u> (<u>two months after expiration of the Tele Go contract</u>), being a Notice of Entry *filed by Vider* (*not by Tele Go's attorney)* of  Judge Baily-Schiffman's Order granting the various motions made by Tele Go and by Vider (i) to consolidate the four pending actions; (ii)  to dismiss Sury and Mendel's Richmond County action against Reiner and Klein, and (iii) to  send all matters to Bergman's Rabbinic Arbitration.

138)    Frustrated by the morass which Reiner had created in the Tele Go action, while not actually a party, Mendel and Sury retained Mariam. Zakhary of the Staten Island Law Firm of Corash & Hollender, who, on <u>October 6, 2020</u> filed a separate action in Richmond County (Index No. 151765/2020) directly against Reiner (then a 34.25% owner) and his (then-20.75% "partner") Yoel Klein, seeking either (i) Rescission of the Partnership Agreement, or (ii) Declaring (a) that the non-compete clause and waiver of the right to seek judicial dissolution were non-enforceable, (b ) that based upon Reiner's conduct he should be deemed to have forfeited his interest in Kidline pursuant to the terms of the partnership agreement; and (c) that Klein did not have an interest in the corporation, since consent of the other shareholder to the transfer had not been obtained.

139)    On <u>October 20,2020</u> Mariam. Zakhary substituted in as attorney for Sury and Kidline in the Tele Go case, replacing Israel Goldberg, in an effort to break the logjam created by Reiner. In an effort to facilitate resolution, Ms. Zakhary agreed to a number of adjournments, based upon **Vider's representations to the court that he was engaging in good-faith settlement negotiations and preparing a Settlement Agreement**.

140)    On <u>January 18, 2021</u>, instead of producing a Settlement Agreement, Vider filed extensive motions and cross motions in the Tele Go case.

141)    <u>On January 26, 2021,</u> Morrison Cohen LLP (David Scharf),  experienced in Rabbinical Arbitration as well as State Court commercial litigation, substituted in as attorneys for Plaintiffs, Sury and Kidline in the Tele Go Action, as well as attorneys for Plaintiffs Mendel and Sury in the Richmond County action against Reiner and Klein.

### ***<u>Chaim Kohn and Infinite  Solutions NY, Inc help Reiner create PRIVACY CHAOS</u>***

142)    In <u>July of 2020</u>; contemporaneously with (i) Reiner's ***<u>first</u>*** creation of FINANCIAL chaos by **locking Sury out of the Chase Account;**  (ii) Reiner's ***<u>second</u>*** creation of  BUSINESS chaos by **preventing the switch away from Tele Go phone service**; and (iii) Reiner's ***<u>third</u>*** creation of  LEGAL havoc by actively **assisting Tele Go** in opposing  Sury's litigation on behalf of Kidline; Reiner, through his surrogate Chaim Kohn, and Kohn's information technology company, Infinite Solutions NY, Inc created a ***<u>fourth</u>*** **type of chaos:** INVASION OF PRIVACY**.**

143)    Kohn had been serving as Kidline's IT consultant. When Kidline hired Infinite Solutions NY Inc. Mendel had a private conversation with Kohn, explaining that Kidline was a company of two partners who did not see eye-to-eye. Mendel advised Kohn that it was essential that he respect the privacy of each side: Mendel did not want access to Reiner's computers and email, and Reiner could not have access to Mendel's and Sury's email. Kohn clearly stated that he understood this concern and agreed to maintain this separateness.

144)    Kohn, as System Administrator, upon information and belief had honored this explicit condition of his engagement.

145)    During the course of  Bergman's Arbitration-proceedings, Mendel heard Reiner refer to private information that appeared in emails between Mendel and Sury, and emails with Mr. Goldberg, Mendel's attorney.

146)    This shocking discovery caused Mendel to hire Cyber Convoy, a security service to monitor access to his and Sury's Kidline emails

147)    On July 8, 2020, Mendel received an Incident Report from Cyber Convoy that occurred on July 7, 2020, at  10:09 that someone had received some or all emails within the Kindline.org domain

148)    A Cyber Convoy Report shows that  on July 22, 2020, Kidline's Security cameras were de-activated at 10:57am until July 23, 2020 at 8:46pm .

149)    The leaking of personal email information subject to both spousal privilege and attorney-client privilege during the course of  heated Arbitration, combined with the occurrence and timing of these two cyber-security incidents triggered Mendel to commence a WhatsApp exchange with Kohn on  July 23, 2020,  At 9:39 pm **Kohn admitted to Mendel  that, at Reiner's insistence, on July 7, 2020. he had given Reiner access to Mendel's and Sury's email accounts**.

150)    On February 9, 2021,  shortly after being substituted as attorney for Plaintiffs in the Richmond County case against Reiner and Klein and in the Kings County Tele Go case, Morrison Cohen, LLP, representing Sury, individually and on behalf of Kidline, commenced suit in Richmond County against Infinite Solutions NY, Inc and Chaim Kohn under Index. No 150287/2021

### *Yossi Reiner and JCR Printing Inc*

151)    Yossi Reiner's role in the "<u>Kidline Scheme</u>" is enumerated above.

152)    Based upon the aforesaid conduct, Sury, individually and on behalf of Kidline, commenced an action against JCR Printing, Inc and Yossi Reiner, in Supreme Court, Richmond County on February 11, 2021, Index Number 150309/2/21

153)    Yossi Reiner and his printing company also played a key role in the "<u>Arbitration Scheme</u>"

154)    On <u>June 30, 2020</u>, Mendel's attorney, Israel Goldberg, sent an email to  Bergman, ,Reiner, and his attorney, Vider,  reporting  the discovery that that JCR had not actually been doing the printing of Kindline Magazine for the past 5 ½ years. Rather, JCR had outsourced the work at a fraction of the amount JCR had billed Kidline. If this were true, it would not only prove that [David] Reiner, by insisting that his brother be contracted to print the magazine, had breached his duty of loyalty. It would also mean that Kidline had a substantial claim against JCR and Yossi Reiner. JCR's records could also be reviewed to determine if [David] Reiner received kickbacks from JCR: another violation of the Partnership Agreement and a triggering event for the forfeiture clause in the Agreement[9]

155)    At the Arbitration hearing held on <u>September 10, 2020</u>, Bergman addressed the issue which Mendel  had been raising, that Yossi Reiner produce the books of JCR Printing. Accordingly, Bergman had directed Yossi Reiner to appear that date, which he did.

---

[9] "40.  It is agreed  that if it will be determined  that a partner has, for any reason whatsoever, embezzled the partnership account and withdrew a sum of money that he is not entitled to according to this agreement, that the principal  be returned, and the other partners are entitled  to remove  him from the business  without paying him any money for his partnership interest."

156) In addition, to ensure that all involved had agreed to the Rabbinical Arbitration (and thereby insulate the dispute from the State Court), Reiner's so-called partner, Yoel Klein was also summoned to the hearing for the purpose of signing the Rabbinical Arbitration Agreement as well. Rather than sign the Agreement, Klein assigned his interest in Kidline to Reiner.

157) There came a moment that day when Reiner, his attorney (Israel Vider) and Rabbi Bergman all realized that Sury, who had succeeded to ownership of Mendel's Kidline shares had never consented to participate in the Arbitration (nor had she ever appeared or participated in any of the proceedings). Therefore, the men concluded that unless Sury signed the Arbitration Agreement, any decision of the Arbitrator would be meaningless and unenforceable.

158) To obtain Sury's consent to the Arbitration, the aforesaid individuals coerced Mendel to immediately call his wife and say: *"Please do me a favor and come immediately to Rabbi Bergman's office to sign an Arbitration Agreement or there will be a bad judgment against me".*

159) Mendel made the call as requested and reported to Sury that if she did not sign the agreement, he was told that he would have trouble getting work in the Hasidic community.

160) Mendel's attorney Israel Goldberg also called Sury and advised her that it had been agreed by all parties that her signed agreement would be held in escrow by Rabbi Bergman until Yossi Reiner submitted to Arbitration and produced the requested JCR business records to document the amount of overbilling.

161) Under extreme duress, worried that if she refused to sign, Mendel would not be able to support his family, and based upon the escrow condition, Sury agreed to come to Rabbi Bergman's office to sign the Arbitration Agreement.

162)     Sury arrived at Congregation  Bnei Avrohom, where Bergman was conducting all Arbitration Sessions, but texted Mendel that she was afraid to go  upstairs to a room full of men who were ruining their lives.

163)     Rabbi Bergman went downstairs <u>alone</u> to meet Sury outside and handed her a document which she signed without reading, she returned the document to Bergman without receiving a copy.

164)     Rabbi Bergman returned upstairs and both Mendel and his attorney, Israel Goldberg, reiterated that  the Agreement was to be held in escrow by Rabbi Bergman. Nevertheless, Bergman handed the document to David Reiner's Attorney, Israel Vider <u>*to take home and  notarize*</u> (even though Vider had not been present when Bergman met with me). Neither Sury nor Mendel received a copy of that Agreement.

165)     The escrow requirement was documented in an email dated  <u>September 10, 2020, at 9:29 pm</u>, by Mendel's attorney Israel Goldberg to Rabbi Bergman, Mr. Vider (David Reiner's attorney) and Mendel's Rabbinic Advisor, Rabbi Heilpern.As Goldberg recited it, the signed Arbitration Agreement <u>could not be released from escrow until Bergman issued an Interim P'sak [Decision]</u> which resolved the pending issues, namely, the dispute regarding **Tele Go** and **"*other governance issues submitted for determination*"**

166)     Based upon the chaotic events created by Reiner immediately following Bergman's "buy-out" directive, which had been addressed during the course of Arbitration between <u>May 11, 2020,</u> and <u>September 10, 2020,</u>  <u>the conditions for release of Sury's consent to Arbitration, encompassed within the scope of Mr. Goldberg's email can be defined as the following **seven** items:</u>

(i)     <u>Tele Go 1:</u>**Bergman's determination whether** Reiners efforts, (with the assistance of Avi Boas Reiner's employee at Abaline Paper Products,

whom Reiner had secretly installed as Kidline's phone system administrator, at the time that Reiner had insisted that Tele Go be chosen as Kidline's phone provider) to block the transfer of phone service which Sury had tried to implement in <u>July and August of 2020</u>, were based upon true Kidline business purposes, or simply intended to create chaos and prevent the implementation of Bergman's oral decision that one person must buy out the other.

(ii)   <u>Tele Go 2:</u> **Bergman's determination whether** Reiners efforts, with the assistance of Avi Boas, to secretly record phone calls and voice messages, had a legitimate Kidline purpose or whether it was an improper invasion of privacy during the course of Arbitration

(iii)   <u>Tele Go 3:</u> **Bergman's determination whether** Reiner's efforts to provide Defendant Tele Go with documents and other assistance in <u>opposing</u> the action Sury had commenced on <u>August 24, 2020,</u> to force Tele Go to switch Kidline's phone service, had a legitimate Kidline business purpose

(iv)   <u>Infinite Solutions</u>: **Bergman's determination whether** Reiner's use of Chaim Kohn and his company, Infinite Solutions NY, Inc, Kidline's IT consultant, in <u>July of 2020</u>, to obtain copies of privileged email communications among Sury, Mendel, and Mendel's attorney (regarding (1) the JCR overcharging, (2) Sury's efforts to obtain a new accountant, and (3) the pending Arbitration), from Sury's @kindline.org and Mendel's @kindline.org email accounts) had a legitimate business purpose or was an improper attempt to obtain privileged communications from an adversary during the course of  Arbitration.

(v)   <u>JCR Printing:</u>  **Yossi Reiner's production** of the business records of his company, **JCR** Printing Inc. so Sury could audit JCR's overcharging  of Kidline for 5 ½  years of printing, (a) to seek recovery for the benefit of Kidline from JCR and Yossi Reiner and to (b) to investigate the likely payment of kickbacks to his brother, David, to determine if he had breached his Duty of Loyalty to Kidline by mandating the use of JCR as Kidline's printer and by receiving kickbacks which would trigger the forfeiture clause of the old partnership agreement. .

(vi)   <u>Banking 1: :</u> **Bergman's determination** whether Reiner should be penalized for unilaterally and arbitrarily **refusing to pay ordinary course business expenses (including payroll and critical suppliers)** which created financial chaos for Kidline right after Rabbi Bergman changed his mind about requiring a buyout of one person by the other at the beginning of  Arbitration.

(vii)   <u>Banking 2:</u>  **Bergman's determination** whether both parties should have full and equal access to the Kidline bank accounts they were respectively controlling.

167)    Rabbi Bergman  confirmed his acknowledgement to the escrow requirement in his Response of September 13, 2020, at 8:04 AM, at the end of the email thread which Mr. Goldberg had started on  September 10, 2020

168)    The fact that the agreement was to be held in escrow was recited in another contemporaneous email on September 21

169)    Since Sury was never given a copy of the papers which she had signed, and since Rabbi Bergman had given the papers  to Mr. Vider, Sury was anxious to see a copy for two reasons. First , because she signed <u>what she was told to sign,</u> without ever reading it and wanted to see what was written in that document;  Second, because she suspected <u> that Mr. Vider might make his own changes,</u> out of the presence of Mendel's attorney, Mr. Goldberg. Accordingly, on <u>September 23, 2020</u> , Sury sent an email requesting a copy of what she had signed. *Acknowledging the escrow requirement*, Bergman refused to provide a copy (even to the signer of the document) unless "both parties agreed" and Vider then refused to consent to release to Sury a copy of the document she had signed. To this date, Sury has never received  a copy.

170)    Rabbi Bergman issued his Interim Decision on <u>October 1, 2020</u>.  The Interim award <u>completely failed to address conditions (i) through (vi)</u> recited above. As to <u>condition (vii)</u> the Interim Decision  mandated joint decision-making on expenditures, however, it <u>did nothing to prevent Reiner from repeating his tactic of creating chaos as recited in condition (vi).</u> Furthermore, while the Interim Decision required Mendel and Sury to provide Reiner with full access to Kidline's Northfield Bank account which Mendel and Sury controlled; it <u>failed to require Reiner to do the same</u> with regard to Kidline's Chase Bank accounts which he controlled

### *Reiner creates financial chaos - AGAIN*

171)    In <u>September 2020</u>, just prior to commencement of the Richmond County action against Reiner and Klein, Reiner created financial chaos a **second time**, by moving **all funds** from the Operating account (ending in 5006) from which Sury had scheduled checks and electronic payments to be made (leaving that account with an available balance of $0.00, to the Subscription Account (ending in 2581) (which was not used for payment of bills) which thus had balance of $164,713, and that the company credit card (which was regularly used for purchases of materials and supplies) had available credit of $0.00. During the course of settlement discussions, and prior to the end of 2020, Reiner closed the Subscription account, and took the $164,712 for his own personal benefit, in violation of the initial understanding between the partners, which called for forfeiture of partnership interest for theft of funds.,

172)    In <u>November 2020</u>,  after commencement of the Richmond County Action, during active settlement negotiations and in the course of her regular duties as bookkeeper, Sury attempted to monitor the Kidline accounts and discovered she had been locked out of the account.

173)    In <u>December 2000</u>, Sury received a notice from the NYC Department of Finance that a check in the amount of $4,643 drawn on the Kidline Operating Account for payment of NYC Corporation Tax had bounced**.**

### *Mendel Seeks Religious Guidance as to Bergman's conduct.*

174)    Desirous of compliance with Jewish Law, but conflicted by Bergman's bias as an Arbitrator, Mendel sought advice from three independent religious authorities.

175)    On <u>December 7, 2020</u>, he  presented to **Rabbi Israel Meir Koenig , Chief of the Rabbinical Court Orech Mishor of Boro Park** the detailed facts he had observed since May of

2020 as to Rabbi Bergman's conduct of the Arbitration.  Rabbi Koenig issued a formal Opinion as to Mendel's rights under Jewish law. After stating his detailed assumptions., Rabbi Koenig concluded:

> If these statements are correct, under Jewish law, the arbitration agreement has no legal validity and the 'third**"[Bergman] shall recuse himself from the matter"**

176)    Mendel also presented the fact situation to the renowned **Jerusalem Rabbinic Court "B'tzel Hachochma"** seeking advice as to his rights under Jewish Law. That Court sent it's  reply dated <u>December 10, 2020</u> . After reciting Mendel's  allegations of deceitful conduct by Reiner and his brother Yossi, Kidline's printer,  and the bias exhibited by Rabbi Rabbi Yaffe-Schlezinger concluded:

> And if it is true and correct that this is how things are, then the entire ruling of the aforementioned arbitrator is not worth the paper it is written on, and it is null and void in essence, and his ruling and his manner has no validity whatsoever In view of the above**, Mr. Mendel Panet is given absolute permission to defend himself in any court of law of any type,** to save his money and not lose his property that has been exploited by the other party, until they agree to discuss this whole issue in the one and only way, it being amicable arbitration (each party chooses its own arbitrator), as is the Law of the Torah.

177)    In addition to seeking an interpretation of Jewish Law from two Rabbinic Courts, Mendel also obtained an Opinion Letter dated <u>December 15, 2020</u> from **Israel Mandel, a world-renowned Attorney, Jurist and Certified Mediator** of both a legal and a Halachic (Jewish Law) view as to the conduct of Rabbi Bergman as Arbitrator, and Mendel's rights under secular as well as religious law Mandel's Opinion raised two distinct issues: (i) whether the Arbitrator himself should be removed, and (ii) whether the dispute in issue was properly subject to Rabbinic Arbitration. Mandel concluded that

> (i)    When the <u>Arbitrator was untrustworthy</u>, he <u>should be removed</u>;

and he recommended that in the present case and

(ii) Where the nature of the dispute between the parties was based upon <u>untrustworthy behavior between partners</u> as in the present case, that type of proceeding <u>is not the proper subject of Rabbinic Arbitration</u>, which is grounded upon a goal of a consensual resolution[10], thus the matter should be removed from Arbitration and decided by a secular court.

178) These three religious determinations, grounded in the concept of justice, established for Mendel the principal that when Justice was not being delivered through Rabbinic Arbitration, Jewish law allowed him to revert to secular courts to correct injustice, so long as he first obtained a Permission Slip from the Rabbinic Courts by showing just cause. Thus Mendel continued his search for justice by participation in the NYS Courts.

### ***Elliot Blumenthal, Esq enables Reiner to deceive Judge Baily-Schiffman by creating a false narrative that multiple independent parties sought to engage in Rabbinic Arbitration***

179) On a parallel course with Bergman's Arbitration proceedings, the Tele Go litigation continued in Supreme Court, Kings County.

180) On <u>September 8, 2020</u>, at Document Numbers 19 et seq., Sedhom Law Group, LLC representing Tele Go, filed opposition to the Order to Show Cause brought by Sury, individually and on behalf of Kidline against Tele Go Inc.

181) On <u>November 30, 2020</u>, fifty documents later, (Tele Go Documents 69 and 70) Tele Go replaced its attorneys and installed Elliot Blumenthal as new counsel, who filed a Consent to Change Attorney and a Notice of Appearance on that date.

182) Upon information and belief, the Sedhom Law Group billed and was paid substantial legal fees during its period of representation.

---

[10] as distinguished from American -style Arbitration, which is the opposite of Mediation

183)    Upon information and belief, the <u>purpose</u> of Blumenthal's representation was, in addition to facially defending the action against Tele Go, to create the illusion (i) that the interests of Kidline and the interests of Tele Go were aligned and (ii) that it was in the interest of Tele Go that the action be referred to Rabbinic Arbitration.

184)    In fact, the interests of Kidline and the interests of Tele Go were not aligned. At the time of Blumenthal's retention, Tele Go's contract with Kidline was set to expire by its own terms <u>in only three more months</u>, and  the early-termination fee would have been only $4,278.45 and  Tele Go's <u>monthly service charge was only $462.83</u> .

185)    In fact, the interests of Kidline and the interests of [David] Reiner were <u>not aligned.</u> Kidline was a <u>plaintiff</u> in the Tele Go case, and Reiner and Klein aggressively caused documents to be filed for the <u>defendant</u> in the Tele Go case. In addition Reiner, not personally a party, caused Israel Vider, his personal attorney, who had been representing him as such in the Arbitration proceedings, to file documents in the Tele Go case *purporting to represent Kidline,* but in substance representing only the personal interests of Reiner) *which diverged from the corporate financial and business interests of Kidline.*

186)    Blumenthal was, or should have been aware that the interests of  Kidline and Tele Go and the interests of  Tele Go were not aligned.

187)    On <u>January 20, 2021,</u> Blumenthal, filed an affirmation on behalf of Tele Go **in support** of the cross motion [made by Israel <u>Vider as attorney for  Reiner</u> and Klein  and "Kidline" to (i) compel Rabbinic Arbitration; (ii) consolidate the Richmond County action by Sury and Mendel against [David] <u>Reiner</u> and Klein; and (iii) to dismiss both actions

188)    On <u>March 2, 2021</u>, Blumenthal filed a notice of Appearance. on behalf of Defendants JCR Printing Inc and Yossi <u>Reine</u>r in the Richmond County Action brought by Sury

on behalf of Kidline to recover between $1.5 and $2.2 million for secret overbilling and possible kickbacks to Yossi's brother David. At that time, Blumenthal (who was representing Tele Go and had previously filed the January 20th motions supporting David Reiner's claims, had a conflict of interest in representing defendants Yossi Reiner and JCR who, in Richmond County were being sued by Kidline.

189)    On March 2, 2021, Blumenthal simultaneously filed a notice of Substitution in the Richmond County action which Sury had, on behalf of Kidline, brought against Chaim Kohn and Infinite Solutions NY, Inc. Again, Blumenthal was purporting to represent a Defendant sued by Kidline, when in the Tele Go case, his actions were consistent solely with the personal interests of David Reiner.

190)    Having substituted-in to the Richmond County cases against JCR and Infinite Solutions, Blumenthal, on March 2, 2021, after expiration of Tele Go's contract with Kidline, filed a motion in the **Kings County** Tele Go case on behalf of Tele Go *and all defendants in the JCR and Infinite Solutions cases* (i) to consolidate the three[11] Richmond County Actions into the Tele Go action; (ii) to transfer of all cases to Rabbinic Arbitration before Rabbi Bergman and (iii) to dismiss or stay all cases pending Arbitration

191)    The filing of this motion in the Tele Go case constituted a false representation to Judge Baily-Schiffman that Tele Go, Inc, JCR Printing Inc, Yossi Reiner, Infinite Solutions NY, Inc. and Chaim Kohn all had a genuine interests that required participation in Rabbinic Arbitration, when, in fact it was only David Reiner who wanted to keep his case before a biased and corrupt Rabbi Bergman

---

[11] (i) Action against Reiner and Klein; (ii) Action against Infinite Solutions NY Inc and Chaim Kohn; (iii) Action against JCR Printing Inc and Yossi Reiner.

192)   As a direct consequence of this deception,  Judge Baily-Schiffman entered her

Order dated <u>April 8, 2021</u>, (docketed  <u>April 12, 2021</u>) , *deciding in Blumenthal's favor* all the

pending motions in the Tele Go case.

> (i)  Consolidating the three Richmond County Actions into the Tele Go case
>
> (ii) Dismissing the Richmond County action against Reiner and Klein
>
> (iii)Referring the three remaining actions back to  Rabbinic Arbitration with
>      Rabbi Bergman

### *Pressure to withdraw Appeal*

193)   On <u>May 4, 2021</u>, Morrison - Cohen filed a Notice of Appeal of the April 8th Order.

194)   <u>Over the next nine days</u> immense pressure was placed against Mendel and Sury to

withdraw the appeal and return to Rabbinic Arbitration with Rabbi Bergman.

195)   Th cumulative pressure included the following:

> (i)  The posting and distribution of copies of Rabbi Bergman's Interim Decision
>      on street poles, on Hasidic Social Media, and by paper distribution, creating
>      the false impression that this was a final, all-encompassing decision that had
>      resolved all issues between the parties.
>
> (ii)  The posting and distribution of copies of the Beis Yoseph Writ and a
>      companion Notice falsely "explaining" the Writ and falsely asserting
>      Mendel's non-cooperation (discussed below) on street poles, on Hasidic
>      Social Media and by paper distribution, with knowledge that the Writ  was
>      improperly obtained ex-parte and contained false statements and that the
>      Notice was false.
>
> (iii) In-person interaction by David Reiner, Mendy Reiner and their operatives
>      with Grocery Stores stating that Mendel's pursuit of State Court remedies was
>      a violation of Jewish law, and that he must return to Rabbi Bergman's
>      Arbitration.

196)   Reiner paid three of Mendel's key employees at Hundred Magazine to create an

internal coup, whereby they and other employees would threaten to resign from their positions

unless Mendel and Sury agreed to withdraw the Appeal of Judge Baily-Schiffman's Order and

return to Arbitration with Rabbi Bergman, one of whom did resign.

197)     On <u>May 13, 2021,</u> as a direct consequence of the cumulative pressure creating fear that Mendel would be unable to support his family, Sury directed her attorney, David Scharf to file a letter with the Appellate Division, Second Department withdrawing her appeal.**)**

### ***Post-Decision Arbitration Proceedings***

198)     During the brief hiatus between the Order compelling Arbitration and the withdrawal of the appeal, limited proceedings were held before Rabbi Bergman.

199)     On <u>Friday May 7, 2021, at 2:2:39 PM,</u> one week after David Scharf, Sury's attorney in the Rabbinic Arbitration, had orally made a request for a court reporter, Rabbi Bergman, rather than making a decision on Scharf's request, sent  Scharf an email requiring him to submit a <u>formal written motion</u> for a Court Reporter to <u>be filed by 5:30 that same day,</u> moments before the Sabbath.

200)     This arbitrary email prompted Scharf's scathing response of <u>May 7, 2021</u>, inserted in full below, placing on the record what could not be recorded due to the absence of a court reporter which had been requested on April 30:

> *Rabbi Bergman, frankly this schedule given on Friday evening when you have known, because you excused participation in this afternoons originally scheduled, that I am committed for this afternoon, is impossible to meet And it deprives our client of due process and sufficient time and notice to appear for a trial that you have now for the first time provided a defined schedule. There is no proper arbitration that provides this notice which amount to no notice.*
>
> *This seems nothing more than another action taken by you where you have had ex parte communications with Mr. Vider or his office and you do his bidding*
>
> *Having commented the way he did before you,  without a court reporter, and in view of the prior conduct of intimidation and harassment that you participated in, you must recuse yourself as my client clearly cannot get a fair hearing.*

*Indeed, Mr. Reiner admitted in your presence by holding his hands wide apart of at least 12-14 inches, that he had paid Rabbi's a pile of bills as a bribe for their taking his side.*

*Your glib comment that there are no conflicts shows that you do not take the issue of conflict seriously in that you have made no effort to ascertain the names of witnesses and parties and have failed to disclose prior matters that you have had with counsel, their advisors and the parties.*

*No waiver contained in any arbitration agreement that you participated in coercing, by telling my client that if shed did not sign an agreement to arbitrate, would result in ad adverse ruling against her husband, can result in a waiver of all due process except the right to counsel. You must and have not provided minimal due process and notice and you certainly do not appear to be impartial in the face of a party who gloats that he bribes Rabbis.*

201)     Eventually, the Arbitration hearing was further adjourned due to a motion for a stay, pending in the Appellate Division

### ***Arbitration Round Two.***

202)     On May 12, 2021, after receiving Sury's instructions to withdraw the Appeal, Sury's Attorney David Scharf made a sincere effort to start the second round of arbitration in a constructive manner.  He submitted a letter to Rabbi Bergman  setting forth proposed procedures for continuing, and hopefully concluding the Arbitration in a fashion that complied with concepts of due process and Jewish law. This comprehensive and thoughtful letter is in stark contrast to the way the Arbitration had been conducted. Rabbi Bergman passed up this opportunity to create a format for  resolution, deciding that such a procedure would be up to the parties to decide; not him. Vider immediately rejected the proposal.

203)     After the withdrawal of the Appeal, between June 2021, and February 2022 when the Paneth family was involved in a serious automobile accident, Bergman conducted approximately ten Arbitration Sessions in this "Second Round". The first nine of those sessions were consumed by presentations on behalf of Reiner.

204)    An <u>additional nine</u> sessions were scheduled between June 20,2022 and July 6, 2022, but were never held due to the chapter 11 bankruptcy filing in June 19, 2022

205)    On <u>June 16, 2021</u>, the scheduled hearing was held but no court reporter appeared. David Scharf orally repeated his request for a court reporter, but Rabbi Bergman refused to order one, stating that <u>if both parties don't agree on the issue, there will be no court reporter</u>.  The hearing proceeded without a court-reporter.

206)    On or about <u>June 27, 2021</u>, in the absence of a court reporter, Mendel started to record the session on his phone . Bergman directed Mendel to shut off his phone and Mendel complied. Simultaneously, Reiner brother, Mendy Reiner had been likewise recording on his phone. Bergman did not direct Mendy Reiner to cease recording

207)    In or about <u>December of 2021</u>, at the beginning of the session, Mendel brought a required check to Rabbi Bergman. As Mendel handed it to Bergman, Reiner yelled

> *"I hope it won't bounce. He's running out of money… … This guy's going bankrupt. He doesn't have any money left" .*

At that point Reiner's contingent  [ Attorney Vider and Rabbinical Advisor Spiegel], and Rabbi Bergman himself, all joined in laughter. This prompted Mendel's  Rabbinical Advisor, Rabbi Gold, to interject

> *"What does Justice have to do with money."*

Reiner then said to Rabbi Gold  "Make sure you get paid."

208)    On <u>December 8, 2021</u>, the eighth session, when Mendel  was scheduled to be given an opportunity to present his position, everyone on Reiner's side failed to appear.

209)    Bergman rescheduled, but instead of allowing Mendel to present, he granted Reiner two additional dates for presentation of his position: <u>December 22,2021</u> <u>and December 23, 2021.</u>

210)    On <u>January 18, 2022</u>. Mendel was finally allowed **one day** to present his case.

.Rabbi Bergman then granted Reiner's request to present additional information and **scheduled eleven more sessions.**

211)    On <u>February 2, 2022,</u>  Bergman held what would be his **final Arbitration session** regarding a rabbinical stay of the sale of Hundred Magazine (published by Mendel after he left Kidline, discussed below) issued a year earlier, oh <u>February 24, 2021</u>, by the Rabbinical Court of Boro Park, Beis Din Beis Yoseph

212)    On <u>February 7, 2022</u>, five days after participating in the February 2 hearing, Mendel's Rabbinical advisor, Rabbi Gold, abruptly resigned, presenting the following statement.

> *To Mr. Mendel h. Paneth to whom it may concern*
>
> *My greetings to all*
>
> *I want to let you know after several hearings that I appeared as your Rabbinic adviser, and in particular the last hearing to remove the Rabbinic lien -The Rabbinic lien is not really a lien, it is just a* **judgment** *against you.*
>
> *After my request from the Rabbi (arbitrator) that this can't be possible to continue in hearings and in the same time that other party is directing a battle of arrows and catapults against you causing you great damage, and making your life bitter, in the same time that <u>every hearing is costing you close to twenty thousand dollars</u>, and the Rabbi (arbitrator) told me clear that according to halacha; this lien (Ikul) is null and void.*
>
> *It is clear to me that there is no discussion here at all to find out the truth for real, and a decision has already been made.*
>
> *And in light of the fact that I was asked by* **the Beit Yosef court** *to appear in front of them regarding the Rabbinic lien, and <u>what I heard from* **the Beit Yosef court** *are really things that cannot be put in writing at all</u> , that even if we are now being debated on Kindline. And those hearings by Rabbi Bergman have already cost upon thousands more than a hundred thousand for your side, and <u>even after you have signed arbitration regarding the Rabbinic lien,</u>*
>
> *They have no intention of |want to cancel their verdict, and I was most shocked at what Rabbi Asher Landau (one of the rabbi's in*

*Beit Yosef court) told me, who is under the Rabbinic lien, will nail
human hair (and a expression in old Hebrew as a mind-blowing
corruption), <u>because of that I decided that I cannot continue as a
Rabbinic adviser,</u> and with that I resign and you will have to find
new Rabbinic counsel to help you with the hearings by Rabbi
Bergman,*

*Rabbi Mendel E. Gold*

213)    No further Arbitration sessions occurred thereafter.

### THE ANTI-HUNDRED ANTITRUST SCHEME

214)    On <u>January 19, 2021,</u> Mendel formed the New York Limited Liability Company,

Hundred Publications, LLC, of which he was the sole Member, his 5-year employment

commitment with Kidline having expired  in October 2019 and his 3-year covenant not to

compete having expired no later than September, 2020[12]

215)    The last issue of Kindline Magazine for which Mendel served as Editor in Chief

was published on or about <u>February 7, 2021</u>. In that issue, in interview format, Mendel

announced that he was leaving Kindline and starting a new magazine.

216)    Since Kidline was not dissolving, Mendel expected that Kindline Magazine would

eventually be published again with a new Editor and Chief. In the interim, Sury, who remained a

Kidline shareholder and its bookkeeper, arranged, through Hundred's attorney, a contract for the

purchase of Hundred Magazine, to be distributed by Kidline, to fulfil Kidline's contracts with its

subscribers, which arrangement would terminate upon Kidline's obtaining a new editor-in-chief

and the resumption  of its publication.

217)     The First issue of Hundred Magazine was published on or about <u>February 14,

2021</u>.

---

[12] Three years from ceasing being an owner of Kidline, which occurred no later than September 2017, upon the
filing of the 2016 corporate income tax return in which Sury was listed as the named shareholder.

218)    Mendel's efforts to start-out on his own triggered  Reiner, together with his collaborators and facilitators, to commence a new "Scheme" aimed at destroying Mendel's personal reputation and putting Hundred Magazine out of business.  This Scheme, like earlier and later ones. was an integrated part of Reiner's master-Scheme  "The Peonage Enterprise" , designed to render Mendel subservient to Reiner

219)     From the time Mendel announced that he was leaving Kidline, a new smear campaign against him commenced.

220)    On <u>January 17, 2021,</u> Mendel commenced an advertising campaign for Kidline, by posting on YouTube a video of the "Publishing Museum" which Mendel had created for two months during the <u>summer of 2020</u> at Kidline's offices, to teach children how a magazine was published

221)    For unknown reasons, bad reviews started being posted (six months after the temporary exhibit closed), with personal attacks against Mendel and "hate comments" appeared on a Yiddish gossip channel

222)    Yoel Mandel, publisher of a Yiddish social media platform posted defamatory and false information about Mendel. Recognizing his error in judgment,  Mr. Mandel appeared in person at Mendel's home confessed that he had received this false information from David Reiner, Mendy Reiner,  Moshe Friedman and others on David Reiner's staff. He begged for Mendel's forgiveness, which was provided

223)    On a parallel track, Reiner coopted a segment of  the Jewish Court system to be his tool in preventing Hundred Magazine from becoming a competitor to Kindline Magazine. Reiner put out word in the community that Mendel's publication of Hundred Magazine was a violation of Rabbi Bergman's Arbitration Decision and a violation of Jewish Law.

224)    Nothing in Rabbi Bergman's Interim Award of <u>October 1, 2020</u>  addressed Hundred Magazine, or Mendel's rights to start his own business.

225)    As a consequence of this rumor, representatives of numerous Jewish tribunals besieged Mendel, each soliciting him  to retain their court to resolve the dispute and advising him that failure to submit the dispute to a Jewish Court would cause ostracism of Mendel and his family.

226)    On <u>February 15, 2021</u>, upon Mendel's discovery of David Reiner's plans to obtain a preliminary injunction from one religious court  against the sale of Hundred Magazine, Mendel's attorney Christopher Niro sent a "Cease and Desist" letter to David Reiner and Yoel Klein**,** advising that such conduct was  a violation of New York law, including but not limited to, tortious interference with prospective economic advantage. This advance warning did not dissuade Reiner.

227)    On <u>February 18, 2021,</u> Rabbi Shlomo Chaim Iliovits, Secretary of Beis Din of Hisachdus (a/k/a/ Beth Din CRC) in Brooklyn, called Mendel and advised him that because he was in secular court and there is a dispute with another Jew regarding Mendel's new publication, Mendel must immediately sign an arbitration agreement with a Beis Din, or a Rabbinical Stay will issue against his new publication.

228)    To avoid the risk of bad public opinion in the community, which would constitute a death knell for Hundred Magazine, Mendel engaged a prominent Israeli attorney, mediator and scholar, Rabbi Israel Mandel, who corresponded with Iliovits, requesting proper due process and a hearing before an Ikul (preliminary injunction) could be issued. Iliovits disputed the requested procedure and threatened that if an Arbitration Agreement was not signed immediately, the injunction would be imminent.

229)     Because of the animosity developing between Rabbis Iliovits and Israel Mandel (in Jerusalem), Mendel retained a local Rabbinical Advisor, Rabbi Aron Benzion Mandel.

230)     Rabbi <u>Iliovits</u> of Beis Din CRC in Brooklyn and Rabbi Yechiel <u>Blum</u>, Secretary of Beis Din of Mechon L'Hoyroa in Monsey, together with Rabbi Gershon <u>Spiegel</u> (Reiner's Rabbinical Advisor)  created great pressure on Mendel and Sury to immediately sign up with one of their respective Beis Din for Arbitration regarding Hundred [13]

231)     This started with a formal letter from Beth Din CRC (Silber and Iliovits) on Sunday afternoon On <u>February 21, 2021</u>, giving Mendel 2 or 3 days to appear for a hearing. This letter was highly unusual for four reasons: (i) it required an immediate hearing, although there was no actual emergency; (ii) it recited that it had already met with the other side and had reviewed his evidence (highly irregular); and (iii) it recited knowledge that a number of other Beis Din were also preparing to issue a Writ (it is questionably why  Beis Din would be called upon to issue the same Writ, and why one would know of any others); and (iv) it announced that they were prepared to issue the Writ without his appearance if he failed to comply with the requested speed. This email thread continued until 4:30 pm.

232)     A new email thread started the <u>same day at 7:03pm</u> regarding Mendel's request to sign up instead with Mechon L'Hoyroa in Monsey, N.Y. Emails continued throughout the night until 11:40 pm, and again throughout  <u>Monday February 22, 2021</u>

---

[13] Iliovits and Blum were each vying for Mendel and Sury to sign up for extremely lucrative Rabbinic Arbitration with their respective Beis Din. The Arbitration with Rabbi Bergman cost Mendel and Sury approximately $600,000 including costs of the Arbitrator, Rabbinic Advisor and Legal Counsel. It has always been Plaintiffs' suspicion that the reason Ilowitz and Blum were collaborating rather than competing had something to do with David Reiner or Mendel Reiner.

(i)  Iliovits emailed Blum on  Sunday, February 21 at 7:03pm advising that Mendel had selected Mechon], and Iliovits asked for confirmation and a time for a hearing.14

(ii)  At 7:08pm Blum replied that he was available the following morning.

(iii) At 7:18pm Mendel replied that he did not want others to deprive him of the right, as defendant, to chose which Beis Din to arbitrate, and that he was still awaiting a formal response from his first choice Beis Din.

(iv) At 8:05pm Rabbi Spiegel, as representative of the "Reiner parties"15 replied that they were available for a hearing in the morning at the times Blum ha suggested.

(v)  At 8:08pm Blum indicated he would check with the suggested Arbitrator who was a cousin of Mendel

(vi) At 8:12pm Spiegel, "On behalf of the Reiner Parties" waived any conflict of interest to Mendel's cousin's participation as a co-Arbitrator.

(vii)    At 8:14pm Mendel advised that he could not confirm until he heard from his Rabbinical attorney, (Rabbi Israel Mandel).

(viii)    At 8:16pm Blum reported that Mordechai Babad, the cousin had consented to serve on the Arbitration panel.

(ix) At 9:26pm Spiegel discloses that he and Reiner had already obtained writs from three Rabbinical Courts against Mendel, and threatened to have them released unless Mendel appeared the following morning for Arbitration in Monsey.

(x)  At 10:15 pm Blum advises that, to assure the ability to proceed in the morning, Rabbi Mandel, Mendel's Rabbinical Advisor could participate via Zoom

(xi) At 10:21pm and 10:28pm Mendel requested that Blum call him

(xii)    At 10:40pm, having not heard from Rabbi Blum, Mendel emailed him to explain that he cannot schedule an appointment until he speaks with his Rabbinical Advisor, Rabbi Israel Mandel, who lives in Israel and was then sleeping.

(xiii)    On Monday Feb 22, 2021 at 12:10pm Iliovits emailed Mendel, Blum, Spiegel and Israel Mandel "I did not hear anything from you. ***We need to rush this matter.***"

(xiv)    At 12:24pm Mendel replied to Iliovits:

---

14  Since Blum and Ilowitz were Secretaries to competing Beis Din, it is unclear why they were cooperating in pressuring Mendel to sign up with one or the other, and why both Rabbis continued to participate in the ensuing email threads.

15  Quote in original email. It appears that Mendy Reiner has considered himself a Party, based upon his conduct during the Hundred Enterprise, unless he was David Reiner's silent partner in Kidline, in violation of the rights of Sury.

     **i.**  that he was waiting for Blum to return his call.

     **ii.**  That he didn't understand why Iliovits was pressuring him, because Iliovits and previously advised that he would no longer be involved once Mendel had chosen another Beis Din.:

(xv)    At <u>12:44:pm, Iliovits</u> replied to Mendel that if Mendel does not sign and agreement with any Beis Din quickly, <u>Reiner has demanded that Blum publish a Writ against Mende</u>l

(xvi)    At <u>4:04pm, Blum </u>writes to Mendel requesting a status as to Mendel's connection with his Rabbinical Attorney

(xvii)   At <u>4:08 pm, Mendel</u> replies with screenshots of phone calls: "*Rabbi Gibbs the Rabbinical mentor of David Reiner and Rabbi Yehoshua Heshel Friedman the intermediary are trying to close the matter with a peaceful settlement to please all parties, this has been my focus that last few hours,*"

(xviii)  At <u>4:26pm Blum</u> replies to Mendel that <u>Reiner had informed Blum that he is unwilling to settle outside of a Beis Din.</u>

(xix)    At <u>5:03 pm Blum</u> again writes to Mendel *"Please, <u>we are being ewxtremely7 pressured.</u> I understand that it is hard for you too, but I also want to withhold the release of a writ. Currently id doesn't look like a settlement is working out."*

(xx)    At <u>5:07pm Mendel</u> replies: "I know pressure well, I come from this pressure. I ask of you in favor of both parties to please give us 2 hours from now. This will prevent big heartaches for me and for him and will prevent a big sanctification of God's name. I'm not just pushing it off

233)    Through the attached email chains as well as numerous phone calls the above parties, jointly and severally, acting to further Reiner's conspiracy, threatened Mendel and Sury with the release of pre-obtained writs from various Beis Din intended to destroy the personal reputations of Mendel and Sury, and to prevent Mendel from making a living in the Ultra-Orthodox community, unless they both submitted to rabbinical arbitration before a Beis Din of Reiner's choosing, who was subject to pressure from Reiner to do his bidding, as to issues relating to  the publication and ownership of Hundred Magazine

234)    Based upon this pressure, Mendel, concluding  that both Iliovits and Blum were working together and were biased in favor of Reiner, refused to sign with either Beis Din, but agreed to arbitration with a different Arbitrator, Rabbi Isaac Eichenstein (a/k/a the Galanta Rav)

of Galanta Oir Pnei Yehoshua in Brooklyn with Rabbi Koenig as his designated Co-Arbitrator, along with a rabbi designated by Reiner,  in a 3-member Arbitration Panel.

235)    On <u>February 22, 2022,  Rabbi Koenig,</u> in an effort to prevent issuance of a Writ by Beis Yoseph, provided Mendel with a letter to circulate indicating that there was no longer a need for a Writ because Mendel had agreed to Rabbinic Arbitration.  Mendel emailed it to Mechon (Rabbi Blum); and CRC (Rabbi Silber and Rabbi Iliovits). The following morning Mendel forwarded it to Beis Yoseph (Rabbi Alt and Rabbi Landau) as well**.**

236)    The meeting with Eichenstein was scheduled for <u>February 23, 2021</u>. As Mendel was traveling to the meeting, he heard a rumor  that  Reiner had formally applied to Beis Din Beis Yoseph. for an ex-parte writ prohibiting the distribution of Hundred Magazine. Mendel arrived at the meeting with Rabbi Yisroel Meir Koening who had agreed to be Mendel's designated co-arbitrator and Rabbi Aron Benzion, his Rabbinical Advisor.  Also attending was Rabbi Gershon Spiegel (who had served as Reiner's Rabbinical Advisor before Rabbi Bergman) who would now serve as Reiner's designated co-Arbitrator; David Reiner and his brother, Mendy Reiner.

237)     Mendel alerted Rabbi Eichenstein to the Beis Yoseph rumor. Spiegel confirmed the rumor by placing on the table, in plain view,  the signed Writ (not yet published), which he had brought with him.

238)    Eichenstein assured Mendel  that if any Writ was published to enjoin the printing or distribution or sale of Hundred Magazine until execution of an Arbitration Agreement, then, Eichenstein would publish a letter to confirm that Mendel and Sury had signed up for Rabbinic Arbitration and that the Writ should be ignored since it no longer necessary.

239)    At the meeting with Rabbi Eichenstein, Mendel <u>signed an Arbitration Agreement</u> on behalf of Hundred. Reiner demanded that Arbitration could not proceed unless both Mendel and Sury signed the Arbitration agreement. Initially, Eichenstein agreed with Reiner's position, but because Mendel explained that Sury had no ownership interest in Hundred, <u>it was agreed that she would return to sign in whatever fashion her attorney advised</u>. Since the following day was the day before the Jewish holiday of Purim, it was agreed that after the holiday Mendel would bring his wife to sign the Arbitration Agreement. Reiner refused to sign until after Sury signed.,.

240)    Mendel again expressed to Eichenstein his concern that the Writ might be published before he returned after Purim with Sury. Eichenstein again assured him that if any writ were published, he would write and publish a letter invalidating it.

241)    Mendel, Rabbi Benzion and Rabbi Koenig departed, leaving behind Reiner, Rabbi Spiegel, and Rabbi Eichenstein.

242)    That same day, <u>February 23, 2021 at 5:28 pm,</u> one hour after Mendel and Rabbi Koenig had left the meeting, Eichenstein (galanta@thejnet.com) sent an email containing numerous falsehoods to Mendel's Rabbinical Advisor, Rabbi Aron Benzion Mandel (dinandlaw@aol.com); Rabbi Blum (baisdin@mechon.org); Mendel (eic@hundred.pub),  Rabbi Spiegel (gershonspiegel@gmail.com), Mendel's proposed second arbitrator, Rabbi Koenig (ek6856@gmail.com); Rabbi Silber and Rabbi Iliovits (Beth Din CRC (bd@centralcrc.com); Mendel (at Kidline) (eic@kidline.org)[bounced],David Reiner (davidr@abalinesupply.com), and Mendel's Jerusalem Rabbinical Advisor, Rabbi Israel Mandel (m0522861817@gmail.com):

(i)    Falsely stating that there was a <u>judgment from Rabbi Bergman</u> determining that Mendel, not Sury was the shareholder of Kidline;

(ii)  Falsely stating that "in the end they <u>did not come to any conclusion</u> and regarding signing the arbitration letter" when in fact

   a.  <u>Mendel did sign</u> an Arbitration Agreement with Rabbi Koenig as his "second" and stated that he was prepared to sign with Rabbi Eichenstein as the principal Arbitrator when he and his wife returned after Purim.

   b.  Mendel indicated that <u>Sury would sign</u> in whatever capacity her attorney instructed; and

   c.  David <u>Reiner had refused to sign</u> until Sury did; and

(iii)  Falsely stating that Mendel and Sury <u>would not be returning</u> to Eichenstein, when in fact they had agreed to return immediately after Purim (i.e. the following week).

243)  After Koenig received this email, still sitting in the car with Mendel, he immediately called Eichenstein to protest the false statements, to which Eichenstein replied that Speigel stayed behind after the meeting and had put immense pressure on Eichenstein to send that email.

244)  On <u>February 24, 2021</u>, one day <u>after Eichenstein's false email was</u> <u>received by Reiner, Spiegel, Blum, and Iliovits</u>, and notwithstanding Eichenstein's promise that if Mendel and Sury would both agree to Arbitration, he would advise Beis Yoseph of their compliance and thereby prevent publication of the Writ (preliminary injunction), <u>Beis Yoseph, through its Secretary Rabbi Asher Landau, and its Chief Judge, Rabbi Reuven Pinchas Alt, published the threatened Ikul (Writ and Preliminary injunction),</u> declaring that

> *No person is allowed to assist them [Mendel and Sarah] in any way, including printing and distribution, etc. the newspaper "Hundred" until the defendants have complied with the above-mentioned ruling" :*

245)  Rabbi Alt's Beis Yoseph Writ was <u>issued</u> contrary to Jewish law, and contrary to New York State law, because it was done (i) ex-parte, without providing Mendel an opportunity to be heard; (ii) without any documentary evidence of Rabbi Bergman's decision, and (iii) without any proof that publication of Hundred Magazine was a violation of Bergman's decision.

246)     The Writ was <u>published</u> contrary to Jewish law because the condition for issuance was the failure of Mendel and Sury to submit to Rabbinical Arbitration, and once Mendel had appeared in front of Rabbi Eichenstein on February 23, and agreed to submit to Arbitration with three Arbitrators (Eichenstein, Koenig, and a rabbi of Reiner's choosing), then the condition of the writ (refusal to submit to Rabbinical Arbitration) was extinguished and, even if the writ had been legally issued, it could no longer be published. ..

247)     Since Reiner was present at the meeting with Eichenstein, he knew Eichenstein's email of February 23 was false

248)     Notwithstanding knowledge of the falsity of the Eichenstein email, and that the underlying **basis for Beis Yoseph's Writ had been extinguished** because  **Mendel had attended and agreed to Eichenstein's Arbitration**, Reiner, Mendy Reiner, Rabbi Alt, Rabbi Landau, and Beis Yoseph <u>again</u> sought to create cumulative community pressure against Plaintiffs and their rights by the publication and circulation of the Beis Yoseph Writ throughout the Hasidic Community, as set forth in more detail below:

(i)  On Social Media,

(ii)  On street poles, and

(iii) In-person at Jewish grocery stores.

249)     The circulation of the Writ was intended to cause harm to Mendel, to Sury and to Hundred.

250)     The publication and circulation of the Beis Yoseph Writ e<u>mail</u> did cause the intended harm.

251)     Upon receipt of the published Writ, Mendel sent an email to Eichenstein on <u>Wednesday February 24, 2021, at 8:04 AM,</u> reminding Eisenstein (i) that the prior day it was <u>Reiner</u> who did not want to sign the Arbitration Agreement (until Sury signed) even though

Mended agreed to, and (ii) of the principal of Jewish Law that one who is a "bully" and does not

act in equity is not entitled to come before the Beis Din to seek equitable relief. In that email,

Mendel attached three twitter posts from 7:57 and 7:58 that morning made by Mendy Reiner

which were pages from Rabbi Bergman's Interim Decision of October 1, 2020

252)    A few minutes later, Mendel sent Eichenstein another email with four social

media  posts *which had just been made* by Mendy Reiner (as collaborator with his brother David)

falsely debasing Mendel's character.

> (i)  The first post was Mendy Reiner's comment to an advertisement by Mendel
> for children t listen to explaining that week's Torah reading, Mendy Reiner's
> response was "***Are you crazy this guy threw his mother out with police from
> his son's Bar mitzva he is not a mechanech" (educational figure)***

> (ii) The second post was Mendy Reiner's comment to an advertisement for
> Hundred Magazine : *The war started! The old Kidline boss wants to continue
> with the Kindline with a new staff.*

> (iii)The third post was another Mendy Reiner comment to that Hundred Magazine
> Advertisement: *A few Beis Dins released a writ against selling the new
> magazine from Rabbi Paneth. All the groceries are not taking it anymore.
> Original Kidline publishers are preparing for a fiery war against the
> magazine Hundred*

> (iv)The fourth post was a on a Hasidic gossip site  of a copy of Rabbi Bergman's
> Interim Decision with the comment "*Kindline magazine with a battle/
> campaign against Rabbi Paneth that open the new Hundred magazine*

253)    On <u>February 24, 2021</u>, at 11:47 AM, one of Mendel's writers for Hundred had

seen the Beis Yoseph Writ on Social Media and forwarded it to Mendel for an explanation.  He at

11:53, Mendel emailed   Beis Din CRC (Iliovits and Silber); Galanta (Eichenstein) and Bais Din

of Mechon L'Hoyroa (Blum) requesting urgently that they comply with their promise to have the

Writ removed if he submitted to Arbitration, but no answer ever came.

254)    Mendel immediately called Eichenstein requesting Eichenstein to fulfil his

promise that if a Writ were published, he would publish a letter reporting that Mendel and Sury

had signed for Arbitration and that the Writ could be disregarded. Eichenstein  initially denied that he had made such a pledge. After further discussions, rather than taking constructive action, Eichenstein abruptly resigned as Arbitrator

255)   In the void filled by the silence of Blum and Iliovits, and the resignation of Eichenstein, Rabbi Koenig offered his assistance and on <u>February 24, 2021,</u> he issued a letter confirming that Mendel had agreed to arbitration of the Hundred dispute.

> *Regarding the conflict between Mr. Mendel Hersh Paneth, the publisher of the "Hundred" booklet, and Mr. David Reiner, I come to say matters of truth, which can be published,*
>
> *that Mr. Mendel Hersh Paneth obeyed the rabbinical court in every detail,*
>
> *And he has already signed arbitration agreement with me, and he is also ready to sign the arbitration agreement with the Rabbi of Galanta, and obey his ruling.*
>
> *And I sign here that I am the arbitrator on his part, after clarifying these things, in my opinion, there is no reason for a writ, and the dispute will come before the Court of Justice, and whatever they decide, they will do so*

256)   Instantaneously, upon publication of the Writ[16], Reiner, his collaborators, and facilitators distributed the Writ throughout the Hasidic community

(i)  by posting it on social media,

(ii)  by posting it on street poles, and

(iii) by delivering it by hand to Jewish grocery stores.

<u>continuing their concerted effort</u> to put Hundred Magazine out of business. Accompanying the Writ was an incendiary and threatening Hebrew notice prepared by Reiner and his facilitators,

---

[16]  Reiner and his brother Mendy were aware in advance that the Writ would be published, because the previous day they had arranged for Rabbi Eichenstein's email falsely stating that Mendel and Sury had not decided to sign for Arbitration, as the pretext to trigger publication of the pre-issued Writ that they had exhibited before Rabbi Eichenstein.

intended to place the fear of G_d into anyone who offered Hundred Magazine for sale. The

Original document with an English translation is

> *Stay away from the forbidden!*
>
> *An important announcement to all the store owners*
>
> *After the publisher of the kids magazine "Hundred" sat in Beis Din with his ex-partners and after a rabbinical judgement was made and he didn't comply with the rabbinical judgement therefore the honorable Rabbis have ordered to let the public know*
>
> *It is strongly forbidden to buy the magazine "Hundred"*
>
> *The new magazine breached the copyright from his partners the owner of kidline and he is not complying and summoned to the court of the idol worshippers. the owners of the magazine and more than that he summoned to court the experienced "dayan" (arbitrator) that was ruling over this dispute, he raised his hand publicly against the Torah of Moses.*
>
> *The honorable Rabbis of Beis Yosef, published a writ against the publisher of "hundred" and these are the words of the Beis Din.*
>
> *According to the law of Torah it is forbidden for stores and customers to sell or buy the new magazine and there is also a ban on helping people who commit sins and to help people that breach copyright and also a writ the guy that raised his hands against the Torah of Moses. It is forbidden for every person to help him in any way, including printing and distributing until they will comply with the rabbinical judgement.*
>
> *The Plaintiff tried to settle with the defendant and they waited 2 weeks from when the Rabbis prepared the writ but due to the stubborn non-cooperation from the owners of hundred to act according to the Torah laws, we were forced to publish it and hope to force them to abide to the Jewish law. We are sure that fellow Jews will not do any wrongdoings and not lie. In the name of God we will be successful.*

257)    To counter the effort of Reiner and his collaborators to put Hundred Magazine out

of business, and in light of the failure of Rabbi Eichenstein, Rabbi Blum and Rabbi Iliovits  to

comply with their respective promises to report to Beis Yoseph that the conditions warranting the

writ no longer existed, Rabbi Koenig, on March 1, 2021, issued the following letter, hoping it

might lead to the withdrawal of the Writ by Beis Yoseph, or at least to mitigate damage to Mendel and to Hundred"

> *Regarding the rabbinical writ that was released on the magazine "Hundred", on the date 5th of Adar 781 (Feb 25th 2021) we feel that its right to publicly inform, that the owners of the magazine as stated above are ready to obey to the rabbinical court/law and they are ready anytime to stand before a Torah rabbinical court with their counterparty, and they already appointed their decisive arbitrator. I, the signer, is the arbitrator from their side, so it's clear that the order of the stated above lien has no effect.*

258)     Working through his Rabbinical attorney, Rabbi Mandel, Mendel requested Beis Yoseph to remove the writ. He was informed that Beis Yoseph would require a new Arbitration agreement signed by both Mendel and Sury with Rabbi Avrum Rosenberg to satisfy them.

259)     Although Mendel and Sury agreed to appear before Rabbi Rosenberg, Reiner never did, and the Writ was never cancelled

260)     Stooping to a new low, Reiner and his operatives, through this dissemination of false and slanderous information about Mendel, caused Mendel's children to be bullied and insulted at their schools, requiring their parents to change the children's schools, and inflicting terrible emotional impact upon the children and their parents.

261)     Mendy Renier, brother of David Reiner, from his offices at Renewal of Life, Inc, d/b/a Renewal, located at 4721 New Utrecht Avenue in Brooklyn, orchestrated a substantial portion of David Reiner's campaign to put Hundred Magazine out of business by conducting social media campaigns, holding meetings, making phone calls, and hiring "enforcers" to remove Hundred Magazine from Jewish grocery stores and supermarkets.

262)     Use of the Renewal facilities created an air of respectability to Mendy Reiner's conduct.

263) The officers and directors of Renewal knew or should have known that their co-director was conducting nefarious activity under the apparent auspices and authority of their organization.

264) Mendy Reiner, personally, and through his agents, appeared at Jewish grocery stores and supermarkets, exhibiting the Beis Yoseph Writ and the Notification in Hebrew, previously quoted, and/or describing it to representatives of such stores and caused copies of Hundred Magazine to be removed from their shelves.

265) On March 2, 2021, Mendel required emergency medical treatment as a direct consequence of the stress created by Reiner's vicious campaign.

266) On March 2, 2021, Elliott Blumenthal, on behalf of Tele Go, filed a motion in the Tele Go action, to Consolidate all pending actions and send them to Arbitration with Rabbi Bergman.

267) On March 3, 2021, David Scharf, on behalf of Sury and Kidline, filed a letter with the Court objecting to papers filed in that action by Israel Vider on behalf of David, pointing out that Mr. Reiner was not a party to the action and that Mr. Vider had never filed a Notice of Appearance.

268) On March 3, 2021, Rabbi Koenig, Mendel's former Rabbinic Advisor (in the Bergman arbitration), who had just resigned as Mendel's designated co-Arbitrator with Eichenstein, because of Eichenstein's false email, came to the Paneth home in an effort to extricate Mendel and Sury from the pressure they were under from Reiner's campaign. He urged Sury to sign an Arbitration Agreement regarding Mendel's publication of Hundred Magazine with a new Rabbi, rather than Rabbi Eichenstein, namely, Rabbi Rosenberg, as suggested by Beis Yoseph (discussed above) . After two hours of joint discussions and then private discussions with

Sury, explaining that the pressure was affecting Mendel's health, that their children would be kicked out of schools and the family would be ruined if she did not sign, Sury ultimately signed the Arbitration Agreement  under the assumption that once they both signed an agreement to Arbitrate the dispute regarding Hundred, the Writ from Beis Yoseph would be removed, and Hundred could continue to be published and distributed without interference.

269)    Sury and Mendel continued their efforts to proceed with Rosenberg Arbitration  to avoid community ostracism. On <u>March 3, 2021</u>, they attempted to obtain an adjournment of the hearing scheduled the next morning before Judge Baily-Schiffman in the case against Tele Go in Supreme Court Kings County, for the purpose of holding  an Arbitration meeting with Rabbi Rosenberg. Reiner's attorney, Israel Vider, prevented the requested adjournment by first, sending an incendiary email, and then by refusing to draft and circulate a requested "waiver" to allow the Arbitration to proceed.

270)    Vider's email advises Beis Yosef and Rabbi Spiegel of a letter which had just been filed by Sury's attorney David Scharf  in the Tele Go case. Scharf's letter pointed  out that Reiner was <u>not personally a party</u> to the Tele Go case and that Reiner's arguments, submitted through Vider, should be disregarded. Sharf also pointed out that  if an agreement to arbitrate before a religious tribunal existed between Mendel and Reiner, it had <u>no applicability to the sole defendant in that case, Tele Go, Inc</u>.

271)    Falsely asserting that Scharf's email had some relationship to the proposed Rosenberg Arbitration, and sending that email directly to Beis Din Beis Yoseph, and to Speigel served only to fulfil Vider's and Reiner's objective to "stir the pot" rather than to resolve any dispute.  Speigel then forwarded Vider's email to  Rabbi Eichenstein and Mendel's Rabbinic

Advisor, Rabbi Mandel (dinandlaw@aol.com). Mandel forwarded it to Blum

(baisdin@mechon.org), Iliovits (bd@centralcrc.com)  and Spiegel.

272)    At 7:46pm on March 3, 2021 Rabbi Mandel,  Mendel's Rabbinic Advisor)  then

wrote to Rabbi Spiegel ( Reiner's Rabbinic Advisor):

> *Rabbi spigel (sic)*
>
> *I was told by Rabbi eichenstein  (sic)that **he's not considering Paneth's signature on arbitration** until they sign a waiver that reb yisroel [Israel Vider] prepared.*
>
> *We're waiting for hours now that this letter to be emailed to us so it can be signed still tonight.*
>
> *I would also want to understand if Paneth's attorney should be in court tomorrow or is it postponed?*
>
> *Thanks*

273)    Ultimately, there was no adjournment of the next morning's court hearing, and no

arbitration with Rabbi Rosenberg. The aforesaid conduct is representative of the efforts of Reiner

and his functionaries to create chaos, and stress, to punish Mendel and his family for Mendel's

desire to escape peonage, with Reiner's sole objective being to create pain.

274)    After the Beis Yosef Writ was published on February 24th, notwithstanding

(i)  Mendel's agreement to Arbitration with  Eichenstein's Arbitration and to return with his wife the next week;

(ii)  Mendel and Sury's agreement to proceed with a new Arbitration with Rabbi Rosenberg, as requested by Beis Yoseph

(iii) And in light of Reiner's refusal to participate in arbitration with Rabbi Rosenberg,

Rabbi Aaron Benzion Mandel, Mendel's  Rabbinical Advisor for the proposed Arbitration with

Eichenstein and thereafter with Rosenberg, resigned, citing pressure put on him by Reiner.

275)    On March 7, 2021  Rabbi Israel Mandel from Jerusalem, sent an email on behalf

of Mendel and Sury proving that according to Jewish Law, the Beis Yoseph Writ had to be

immediately removed because both Mendel and Sury had signed an Arbitration Agreement.

276)     Notwithstanding the Writ, however, Mendel was still able to sell Hundred magazine to a small number of stores, who refused to be swayed by Beis Yoseph and David Reiner's tactics

277)     On Friday, March 19, 2021,  Rabbi Blum, on behalf of Bais Din of Mechon L'Hoyroa sent Mendel an email which repeated the false statement by Rabbi Eichenstein that Mendel and Sury had refused to participated in Arbitration with Eichenstein gave Medel and Sury until Monday, March 22 to schedule an Arbitration session  regarding Hundred Magazine with Rabbi Avrum Baruch Rosenberg, and, if they failed to do so, Blum indicated that a Writ would be issued.  The footer on the email stated it was confidential

278)     Shortly thereafter, a grocery store owner sent Mendel a copy of what appeared to be an official Writ with the head of Mechon L'Hoyroa, containing the text of the confidential email sent to Mendel. The document, which had been printed on paper and handed out to shoppers outside that grocery stores was being used to humiliate Mendel and discourage shoppers from buying Hundred Magazine. When Mendel emailed Blum as to whether Mechon had published that "Writ", he received no answer. It is unclear whether the Writ was actually issued by Mechon L'Hoyroa or whether the document was a falsified Writ prepared  by Reiner and/or his collaborators.

279)     On April 7, 2021, Mendel sent an email to Blum

(i)   challenging the issuance of any Writ by Mechon.  Mendel pointed out that on March 19, the same day Blum sent his email, Mendel's  Rabbinical Attorney, Rabbi Ben Zion Mandel replied (i) consenting to Arbitration with Rabbi Rosenberg; (ii) requesting a written response whether Reiner had likewise consented and stating:

> *Since they (Reiners ) are publishing your letter that was sent addressed to me, it seems as if the*
>
> *defendants are refusers, and the reality is the opposite, that we have already signed and are ready as soon as possible for Beis Din.*

(ii) indicating that he had received no response from Mechon as to the above request, and that he had complied with all conditions of Blum's March 19 email, namely (i) signing an Arbitration letter with two courts and (ii) signing a stipulation for withdrawal of the state court proceedings prepared by Israel Vider, Reiner's state court attorney and countersigned by Sury's state court attorney David Scharf. .

(iii) in light of the apparent issuance by Mechon of a Writ, requesting that Mechon publish an addition statement indicating Mendel and Sury's compliance; and

(iv) Requesting Mechon to require Reinder to stop distributing the private email.

Mechon and Blum have provided no response.

280)    The Ultra-Orthodox community is serviced by forty to fifty grocery stores  and Jewish Supermarkets in the Boro Park area,  and approximately 100 in the tri-state area. The three largest Jewish Supermarkets in the community are Breadberry, Super 13 and Center Fresh.

281)    After issuance of the Writ,  Samuel Gluck, the principal of Breadberry, Inc. called Mendel and stated that he could no longer sell Hundred Magazine, because Reiner was harassing him.

282)    This was followed by calls from representatives of  Super 13 and Center Fresh, who reported substantially the same situation.

283)    In addition to using his brother Mendy Reiner, David Reiner enlisted  Moshe Friedman, the new Editor-in-Chief of Kidline Magazine, as his voice to make false social media posts, intimidate supermarkets and grocery stores to refrain from selling Hundred Magazine

284)    Once the three large supermarkets refused to sell Hundred Magazine, the smaller grocery stores, which had been victims of forceful removal of the Magazine by Mendy Reiner and his crew, followed suit out of fear of reprisals

285)    On <u>January 26, 2022,</u> almost a year after issuance of the Beis Yoseph writ, in the midst of "Round 2" Arbitration with Rabbi Bergman, Mendel's Rabbinic Advisor, Rabbi Mendel Gold sent an impassioned email to Rabbi Bergman seeking a declaration

    (i)   that the Beis Yoseph "Order"  was a nullity;
    (ii)  That "<u>the Reiners (i.e. David and Mendel)</u> cease their interference with Mr. Paneth's business during the pendency of this arbitration and
    (iii) A direction to Bes Yoseph to issue a interim order rescinding their Order.

286)    Gold, in his email annexed in full**,** excoriated not only Beis Yoseph for issuing an ex-parte Order, but "The Reiners" as well for using an order intended to preserve the status quo to destroy Mendel's business.

> *Mr. Reiner has weaponized this year-old order, taking it to people and businesses to convince them to shun Mr. Paneth and his business. There is no question that Mr. Reiner is maliciously attempting to injure Mr. Paneth, to take away his livelihood and to starve him of the resources he needs to continue to participate in the arbitration before you. It must stop.*

> *Beis Yoseph's "Order" was obtained by Mr. Reiner ex parte – without the knowledge of Mr. Paneth and without giving Mr. Paneth an opportunity to oppose the request or to defend himself. This is not justice.*

> *There is a special danger presented by these secret, one-sided orders. One party, and only one party, can approach a Beis Din of its own choosing (and likely to be favorable to it), present its slanted, one-sided case, and obtain a supposedly binding order, or at least one that can be walked around the community and presented to people on the street as a legitimate piece of paper. These ex parte orders are highly-dangerous and universally disfavored.*

287)    Bergman stated that it had nothing to do with his proceedings and Mendel should address it to Beis Yosef instead.

288)    Despite the harassment by Reiner and his collaborators, Hundred Magazine limped on, but finally succumbed to the war of attrition and published its final issue on or about <u>May 15, 2022</u> .

### *The Bankruptcy Scheme*

289)    After the hiatus due to the Paneth auto accident Rabbi Bergman had scheduled

resumed Rabbinical Arbitration for four consecutive weeks, the first of which was to be on

Monday June 20, 2022.

290)    On June 13, 2022, Sury's attorney, David Scharf, emailed Rabbi Bergman

asserting numerous objections including

> (i) Scharf's previously stated unavailability for a number of these dates and the impracticability of an attorney committing such a large amount of continuous time to a single matter;
>
> (ii) The unfairness of Bergman's allowing unlimited presentation time to the Reiner side, which has escalated the costs of attending proceedings to unreasonable levels for parties of vastly disparate financial wherewithal;
>
> (iii) Bergman's refusal to allow a court reporter at the proceedings;
>
> (iv) Bergman's one-sided Interim Decision which directed the Paneths to provide Reiner with all Kidline books and records and emails they had control of; while failing to require Reiner to reciprocate, notwithstanding that Sury was a 45% owner of the company;
>
> (v) Bergman's failure, for almost two years, to direct Yossi Reiner to provide his books and Records for JCR Printing, relating to the Paneths' claim that Yossi Reiner had grossly overcharged Kidline for the costs of printing over years, the delivery of which was the condition for Sury Paneth's September 10, 2020 consent to participate in the Arbitration. and
>
> (vi) Bergman's failure to address the February 24, 2021, Beis Yosepf Writ enjoining the distribution of Hundred Magazine, which had the effect of putting Hundred Publications out of business.

291)    The inequities recited in the prior paragraph caused Mendel to file for chapter 11

bankruptcy relief on Sunday June 19, 2022, automatically staying Bergman's scheduled

Arbitration hearings and preventing Mendel from having to submit to such continual denial of

due process and to Reiner's War of Attrition.

292)    Although the bankruptcy stay froze the physical Arbitration proceedings, Reiner

and his collaborators have violated the automatic stay rosa.

293) During the pendency of this bankruptcy case Yoseph Freund ("Freund"), filed false documents in the Office of the Richmond County Clerk and on the Claims Register in this Court.

(i) On <u>October 3, 2022,</u> Mendel's bankruptcy attorneys filed with the Bankruptcy Court (as Document 36) a motion to approve a contract for the sale of Paneth's residence. That filing was publicly available to any individual who wished to establish an account providing access. In addition, automatic notification of that filing was provided to all attorneys who had filed Notices of Appearance, including Reiner's attorneys.

(ii) <u>On the identical date</u>, Freund signed a Notarized Declaration, asserting a purported  "Lien" against the residence  along with a supposed "Promissory Note and Agreement" dated <u>August 21, 2018,</u>[17] in the amount of $392,343.98.

(iii) The signature on the purported Note was not genuine.

294) On <u>October 11, 2022,</u> Freund caused that document to be filed in the Office of the Clerk of Richmond County, in the Land Records, against Block 609, Lot 200, purporting to be a lien against the interest of Mendel Paneth and Sarah Paneth in 85 Bolivar Street, Staten Island.

295) Freund knew at the time that the document executed, and at the time it was filed, that it was untrue, and that all sums he had advanced to Mendel had been fully repaid paid between the time of refinance of the Paneth home in August of 2018, and March of 2021 when Sury left the employ of Kidline.

296) Prior to the <u>October 11, 2022</u> "lien" filing, Freund had never sought to enforce his alleged right to payment on the supposed 2018 Note.

297) The sole reason Freund caused that "lien" to be filed on <u>October 11, 2022</u>, was his desire to obtain leverage to extract funds that he was not entitled to, from the anticipated sale of the Paneth homes[18]

---

[17] The same date the Paneths closed on the $937,500 mortgage arranged by Freund.
[18]  In fact, no closing ever occurred because the contract of sale was cancelled.

298) That filing, after the imposition of the Bankruptcy Stay was a violation of the Automatic Stay

299) On <u>December 19, 2022,</u> Freund caused to be filed on the Claims Register of this Court Claim No. 12 in the amount of $450,343.93, in which was subsumed the full $392.343.98 recited in the Richmond County "lien", plus $58,000 in checks purportedly written to or on behalf of Mendel between <u>August 1, 2018</u> and <u>October 11, 2018</u>.

300) Freund signed the Proof of Claim

301) Documentation to support the purported note included charges made on credit cards belonging to Congregation Teferes Moshe, including items that had to do with persons other than Mendel.[19]

302) All amounts actually owed to Freund by Mendel were fully paid prior to March of 2021.

303) Freund made no effort to collect any money from Mendel after <u>March of 2021</u>.

304) The Proof of Claim stating that no part of the claim was secured constituted an admission that the purported lien filed with the Richmond County Clerk was a false instrument submitted for filing.

305) Debtor's counsel informed Freund's Bankruptcy Counsel that the Richmond County filing purporting to be a lien constituted a violation of the Automatic Stay.

306) Freund's Bankruptcy Counsel undertook to advise Freund that his Richmond County filing was a Stay Violation and that he must withdraw the filing.

307) Freund had failed to remove the Richmond County Clerk filing

---

[19] Although not applicable to the case at bar, since Freund actually advanced certain costs of Mendel's home renovations pending a refinance, inasmuch as credit card statements of Congregation Teferes Moshe show home renovation expenses for other families, it is suspected that the Congregation may be selling the benefits of tax-deductible charitable contributions

308)    At the time Freund signed the Proof of Claim, alleging that the funds recited therein were due to him he knew that it was false

309)    The documents filed with the Richmond County Clerk and with the Bankruptcy Court by Freund contained credit card statements of Congregation Teferes Moshe, which Freud represented in such documents, contained purchases made on behalf of Mendel by Freund on the credit card accounts of Congregation Teferes Moshe, and which were unpaid.

310)    These statements were false and known to be false.

311)    The business of Congregation Teferes Moshe was conducted by Freund, with authority of the Officers and Directors of the Congregation.

312)    On <u>October 31, 2022</u>, Triplaneth Inc. was registered with the NYS Department of State as an entity through which Mendel would organize and provided guided tours in Europe of Jewish specific sites to Hasidic Groups. His advertising showed strong initial interest, but no final customers. Upon information and belief, this was caused by negative input from Reiner or individuals operating on his behalf.

313)    On <u>February 28,2023</u> at 6:30 am Mendel was awoken up by the doorbell at his home. he looked out the screen for the doorbell  and saw a man standing at his door for several minutes.  He kept ringing the bell.  Mendel did not answer the door or engage with these people for fear of his family's safety. The man went back to the car, exchanged seats with the driver (both of them were wearing gray hoodies). They both were acting very suspiciously. The first driver seemed to be holding something bulky at his waist, under his sweatshirt. They kept looking over their shoulders to see if anyone was watching them. Mendel's security cameras captured this incident, and he called the police. They informed him that no crime had been committed, but this the incident was very suspicious and urged Mendel to look into it further.

This incident was traumatizing to Mendel's entire family. Upon information and belief, this incident was arranged by Reiner or his collaborators.

314)     As a consequence if this doorbell incident, Mendel retained a security company to upgrades his home security system. They came to do the installation on <u>March 15, 2023</u>. In the course of their work the discovered that there was a live component on the security system originally installed by Chaim Kohn of Infinite Solutions when Mendel renovated his new home. That component, which the new security consultant removed at Mendel's request, and gave to him, apparently enabled a knowledgeable computer person to access other electronic equipment presently used by Mendel and his family in our home. This was very frightening to the family.

315)     On <u>March 13, 2023,</u> Mendel was offered, and he accepted a contract to perform as a cantor for Passover Services at the Raleigh Hotel and Cottages in the Catskills. After the hotel posted an advertisement for the event, featuring his photograph and credentials, his contract was abruptly cancelled. Mendel filed an Adversary Proceeding against the Hotel, which was eventually settled. During a court conference the Hotel General Manager admitted on the Record that the reason for the cancellation that the Hotel had received "phone calls" about Mendel's appearance, and the General Manager stated that he "Didn't want trouble"  Upon information and belief, that "phone calls" originated with Reiner or his collaborators.

316)     <u>During the course of this Bankruptcy case, and through the present date</u>, Mendel has continually sought new business opportunities in the Hasidic community, which is the only realistic  source of income for him[20] At each opportunity, he had discovered that upwards of 80% of potential customers or employers are afraid to do business with him for fear of reprisals by

---

[20]  Although conversant in English, Mendel, born in Belgium and living his entire life within various Hasidic communities, uses Yiddish as his first language for writing and reading. His employment options outside the Hasidic community are limited.

Reiner, for Mendel's disputes with Reiner are well-known in the community (thanks to Reiner's dissemination of defamatory information) and Reiner's contacts and relationships in the community are diverse.

## COUNT 1
## (VIOLATION OF SHERMAN ACT § § 1, 2)

317)    Plaintiff Mendel, re-alleges and incorporates by reference all the allegations in the above paragraphs.

318)    On January 19, 2021, Mendel formed Hundred Publications, LLC ("Hundred") for publication in Yiddish of a religious magazine for the orthodox Jewish families and their children.

319)    On February 14, 2021, Hundred published its first issue and it created a ripple in the Hasidic Jewish community. It was an instant hit in the market. And it threatened Kidline Magazine's monopoly. In the market as explained below, Kidline Magazine was the sole publication of its type, catering to the Hasidic religious community.

320)    Reiner did not like the fame and name of new entrant in the market--Hundred. He devised a scheme and executed it as described above with the other associates to eliminate Hundred.

321)    Reiner used unlawful means to achieve an unlawful result. He eliminated Hundred from the market as described above. He enlisted help of defendants, Rabbi Moshe Bergman, Rabbinical Court of Boro Park, Beis Din Beis Yoseph, Rabbi Reuven Pinchas Alt, Rabbi Asher Landau, Mendel Reiner , Rabbi Gershon Spiegel, Bais Din of Mechon L'Hoyroa, Rabbi Yechiel Blum, Beth Din CRC, Rabbi Mendel Silber, Rabbi Chaim Shlomo Iliovits, Congregation Galanta Oir Pnei Yehoshua and Rabbi Isaac Eichenstein  (Count 1 Defendants)

## ¶Relevant Product Market and Geographic Market

322)   The product market is the publication of Hasidic Jewish Magazines (in the Yiddish language) catering to ultraorthodox Jewish families as readers related to their mundane and spiritual needs in conformity with the Jewish religion and culture.   The relevant market is Hasidic speaking ultra-orthodox children and adults. The magazine is catering to the ultra-orthodox Hasidic Yiddish speaking or reading community.

323)   The ultra-orthodox Jewish community has a geographic market concentrated in and around Kings County [Boro Park and Williamsburg],  Rockland  County [New City, Monsey, Spring Valley, New Square, Airmont], Orange County [Monroe] and Richmond County in New York  and  Ocean County [Lakewood, Toms River] in New Jersey.  And these concentrated Jewish pockets are the area of circulation of Kidline magazine and was of Hundred magazine.  Thus, it is the relevant geographic market to assess the completive implication of the challenged conduct of defendants.

324)   Kidline was the first to capture this relevant product and geographic market by delivering a combination of educational material in the forms of comics, writings, and columns. The combination of education and comic-book art gained popularity and traction within the ultra-orthodox community. Kidline had 100% share of the relevant market, as this was the only magazine in the relevant market. At present and  before the entry of Hundred, there was no substitution of the relevant product magazine. After the forced removal of Hundred there is no competitor to Kidline.

325)   Hundred entered this ultra-orthodox market on or about February 14 of 2021. Hundred with its superior edge in terms of content, quality and attraction to families posed a sudden challenge to the monopoly of Kidline.   Hundred's reach was wider, it not only catered to

the children, it encompassed material of interest to adults, besides having additional columns, articles and new topics.  Hundred had superior quality and quantity of material which detailed both religious and worldly matters impacting Jewish faith, people and their institutions at all educational levels.

326)    As soon as Hundred hit the market, it was an instant success to the extent, that Kidline felt threatened that it could not come up with their sales for at least five weeks after February 14, 2021. Kidline resumed with its publication around March 21, 2021.

327)    The last publication of Hundred was May 15, 2022.  On May 16, 2022, Mendel, cornered and threatened [as described above] sent out via email, social media and regular letters that it would cease its operation.

328)    Count 1 Defendant Reiner and Kidline Magazine have, and at all relevant times had monopoly power in the market for sale of Hasidic Jewish magazines in the relevant market.

329)    Count 1 Defendants were engaging in a combination and conspiracy in restraint of interstate commerce in violation of § 1 of the Sherman Antitrust Act, and in a combination and conspiracy to monopolize such commerce in violation of § 2 of the Act, as well as attempting to monopolize such commerce in violation of § 2.

330)    Count 1 defendants formulated and put into execution a plan designed and intended to eliminate this threat by the device of preventing the sale at of Hundred Magazine at local Jewish neighborhood retail outlets in the relevant geographical market for circulation of the magazines and increasing threats to socially boycott Mendel,  his wife and their children.

331)    Having the plan and desire to injure Hundred, no more effective and more direct device to impede the operations and to restrain the commercial success of Hundred could be found by Count 1 defendants than to cut off its bloodstream of existence —retail outlets.

332) Count 1 defendants willfully reacquired and maintained monopoly power through anticompetitive acts as complained.

### INTERSTATE COMMERCE

333) The products at issue in this case are sold in interstate commerce, and the unlawful activities alleged in this Complaint have occurred in, and have had a substantial effect upon, interstate commerce.

334) Count 1 defendants used unlawful anticompetitive means to keep Hundred Magazine out of the market to achieve anticompetive results.

335) Mendel is a person as defined by section 1 of the Clayton Act, 15 USC §12.

336) The Count 1 Defendants are a "person" as defined by 15 USCS § 12  and it applies to individuals as well as corporations, and officer or employee of corporation may be sued as individual for acts done on behalf of his corporate employer in violation of antitrust laws.

337) Reiner and Count 1 defendants have entered into an unlawful agreement, combination, conspiracy in restraint of trade. Specifically, Reiner and his team engaged in concerted action with Count 1 defendants to oust and keep Mendel or his business out of market.

338) As a direct and proximate result of Count 1 Defendants' violations of the antitrust laws as alleged herein, (1) consumers have been deprived of the full benefits of competition in the relevant market, (2) Mendel has been injured by elimination of his business in an amount to be determined at trial, and (3) Mendel has suffered and is threatened with continued loss or damage to its business and property.

339) Mendel has no adequate remedy at law, and Defendants unlawful conduct will continue unless enjoined.

340) As a consequence of the foregoing conduct of Reiner and his associates in fact, competition between Hundred and Kidline has been entirely eliminated.  Mendel has suffered

economic injury. His business, Hundred Publications, LLC, was not allowed compete in the

market. Mendel was boycotted with the concerted efforts of the Count 1 defendants from

operating Hundred in the relevant market. Defendants' actions were the  proximate cause of

Mendel's inability to keep Hundred Publications LLC in operation.

341)    The plaintiffs are entitled to recover treble damages for their injuries under

section 4 of the Clayton Act, 15 U.S.C. §15.

## COUNT 2
## VIOLATION OF 18 U.S.C. § 1962 (C)
## ASSOCIATED WITH KIDLINE ENTERPRISES INC, ENTERPRISE

342)    Plaintiff Mendel, re-alleges and incorporate by reference all the allegations in the

above paragraphs.

343)    Mendel Paneth and Sarah Paneth are each a "person" within the meaning of 18

U.S.C. §§ 1961(3) and 1964(c).

344)    Defendants David Reiner, Joseph Reiner a/k/a Yossi Reiner, JCR Printing Inc.,

Rabbi Moshe Bergman, Congregation Bnei Avrohom, Tele Go Inc, Avi Boas, Chaim Kohn,

Infinite Solutions NY Inc, Elliot Blumenthal, Rabbinical Court of Boro Park, Beis Din Beis

Yoseph, Rabbi Reuven Pinchas Alt, Rabbi Asher Landau, Mendel Reiner , Rabbi Gershon

Spiegel, Bais Din of Mechon L'Hoyroa, Rabbi Yechiel Blum, Beth Din CRC,  a/k/a Beit Din of

Hisachdus, Rabbi Mendel Silber, Rabbi Chaim Shlomo Iliovits, Congregation Galanta Oir Pnei

Yehoshua, Rabbi Isaac Eichenstein, and Yosef Freund are each a "person" within the meaning of

18 U.S.C. §§ 1961(3 and 1964(c).

345)    Kidline Enterprises Inc. is an "enterprise" within the meaning of 18 U.S.C. §§

1961(4) and 1962(c), which enterprise was engaged in and the activities of which affected

interstate commerce during the relevant times. This cause of action is asserted against all

Defendants (the "Count 2 Defendants") and is asserted in addition to and in the alternative to the 3rd and 4th Counts.

346)    The Defendants. David Reiner, Joseph Reiner a/k/a Yossi Reiner, JCR Printing Inc., Rabbi Moshe Bergman, Congregation Bnei Avrohom, Tele Go Inc, Avi Boas, Chaim Kohn, Infinite Solutions NY Inc, Elliot Blumenthal, Rabbinical Court of Boro Park, Beis Din Beis Yoseph, Rabbi Reuven Pinchas Alt, Rabbi Asher Landau, Mendel Reiner , Rabbi Gershon Spiegel, Bais Din of Mechon L'Hoyroa, Rabbi Yechiel Blum, Beth Din CRC,  a/k/a Beit Din of Hisachdus, Rabbi Mendel Silber, Rabbi Chaim Shlomo Iliovits, Congregation Galanta Oir Pnei Yehoshua, Rabbi Isaac Eichenstein and Yosef Freund, were each employed by or associated with an enterprise, that is, Kidline Enterprise Inc. , and did conduct or participate, directly or indirectly, in the conduct of the affairs of the  Kidline Enterprises Inc. through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1)(B) and 1961(E) and 1961(5) and 1962(c), to wit:

> (a) Multiple instances of mail fraud in violation of 18 U.S.C. § 1341;
> (b) Multiple instances of wire fraud in violation of 18 U.S.C. § 1343;
> (c) Multiple instances of subjecting Mendel Paneth to Peonage in violation of 18 U.S.C. § 1581;
> (d) multiple instances of money laundry in violation of 18 U.S.C. 1956;
> (e) Multiple instances of breaking into computers in violation of 18 U.S.C. § 1030;
> (f) Multiple instances of Hobbs Act violation, 8 U.S.C. § 1951;  and
>  (g) filing false claims in bankruptcy court in violation of 18 U.S.C. § 152

347)    By reason of the violation of 18 U.S.C. § 1962(c) committed by Defendants David Reiner, Joseph Reiner a/k/a Yossi Reiner, JCR Printing Inc., Rabbi Moshe Bergman, Congregation Bnei Avrohom, Tele Go Inc, Avi Boas, Chaim Kohn, Infinite Solutions NY Inc, Elliot Blumenthal, Rabbinical Court of Boro Park, Beis Din Beis Yoseph, Rabbi Reuven Pinchas Alt, Rabbi Asher Landau, Mendel Reiner , Rabbi Gershon Spiegel, Bais Din of Mechon L'Hoyroa, Rabbi Yechiel Blum, Beth Din CRC,  a/k/a Beit Din of Hisachdus, Rabbi Mendel

Silber, Rabbi Chaim Shlomo Iliovits, Congregation Galanta Oir Pnei Yehoshua, Rabbi Isaac

Eichenstein and Yosef Freund, Plaintiffs were injured in an as yet undetermined amount, believed

to be not less than approximately Ten Million Dollars ($10, 000, 000.00), within the meaning of

18 U.S.C. § 1964(c).

### COUNT 3
### VIOLATION OF 18 U.S.C. § 1962(C)
### ASSOCIATED WITH ASSOCIATION-IN-FACT ENTERPRISE)

348)    Plaintiffs re-allege and incorporate by reference all the allegations in the above

paragraphs.

349)    Mendel Paneth and Sarah Paneth are each a "person" within the meaning of 18

U.S.C. §§ 1961(3) and 1964(c).

350)    Defendants David Reiner, Joseph Reiner a/k/a Yossi Reiner, JCR Printing Inc.,

Rabbi Moshe Bergman, Congregation Bnei Avrohom, Tele Go Inc, Avi Boas, Chaim Kohn,

Infinite Solutions NY Inc, Elliot Blumenthal, Rabbinical Court of Boro Park, Beis Din Beis

Yoseph, Rabbi Reuven Pinchas Alt, Rabbi Asher Landau, Mendel Reiner , Rabbi Gershon

Spiegel, Bais Din of Mechon L'Hoyroa, Rabbi Yechiel Blum, Beth Din CRC,  a/k/a Beit Din of

Hisachdus, Rabbi Mendel Silber, Rabbi Chaim Shlomo Iliovits, Congregation Galanta Oir Pnei

Yehoshua, Rabbi Isaac Eichenstein, Yosef Freund are each a "person" within the meaning of 18

U.S.C. §§ 1961(3 and 1964(c). These defendants jointly composed an **association-in-fact**

**enterprise.**

351)    The plaintiffs plead association-in-fact enterprise as an "enterprise" within the

meaning of 18 U.S.C. §§ 1961(4) and 1962(c), which enterprise was engaged in and the activities

of which affected interstate commerce during the relevant times. This cause of action is asserted

against all Defendants  (the "Count 3 Defendants") and is asserted in addition to and in the alternative to the 2nd  and 4th Count.

352)   The Defendants. David Reiner, Joseph Reiner a/k/a Yossi Reiner, JCR Printing Inc., Rabbi Moshe Bergman, Congregation Bnei Avrohom, Tele Go Inc, Avi Boas, Chaim Kohn, Infinite Solutions NY Inc, Elliot Blumenthal, Rabbinical Court of Boro Park, Beis Din Beis Yoseph, Rabbi Reuven Pinchas Alt, Rabbi Asher Landau, Mendel Reiner , Rabbi Gershon Spiegel, Bais Din of Mechon L'Hoyroa, Rabbi Yechiel Blum, Beth Din CRC,  a/k/a Beit Din of Hisachdus, Rabbi Mendel Silber, Rabbi Chaim Shlomo Iliovits, Congregation Galanta Oir Pnei Yehoshua, Rabbi Isaac Eichenstein and Yosef Freund, were each employed by or associated with an enterprise, that is, Association-in-Fact enterprise , and did conduct or participate, directly or indirectly, in the conduct of the affairs of the  Association-in-Fact  through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1)(B) and 1961(E) and 1961(5) and 1581 and 1962(c), to wit:

> (a) Multiple instances of mail fraud in violation of 18 U.S.C. § 1341;
> (b) Multiple instances of wire fraud in violation of 18 U.S.C. § 1343;
> (c) Multiple instances of subjecting Mendel Paneth to Peonage in violation of 18 U.S.C. § 1581;
> (d) multiple instances of money laundry in violation of 18 U.S.C. 1956;
> (e) Multiple instances of breaking into computers in violation of 18 U.S.C. § 1030;
> (f) Multiple instances of Hobbs Act violation, 8 U.S.C. § 1951; and
> (g) filing false claims in bankruptcy court in violation of 18 U.S.C. § 152

353)   By reason of the violation of 18 U.S.C. § 1962(c) committed by Defendants David Reiner, Joseph Reiner a/k/a Yossi Reiner, JCR Printing Inc., Rabbi Moshe Bergman, Congregation Bnei Avrohom, Tele Go Inc, Avi Boas, Chaim Kohn, Infinite Solutions NY Inc, Elliot Blumenthal, Rabbinical Court of Boro Park, Beis Din Beis Yoseph, Rabbi Reuven Pinchas Alt, Rabbi Asher Landau, Mendel Reiner , Rabbi Gershon Spiegel, Bais Din of Mechon L'Hoyroa, Rabbi Yechiel Blum, Beth Din CRC,  a/k/a Beit Din of Hisachdus, Rabbi Mendel

Silber, Rabbi Chaim Shlomo Iliovits, Congregation Galanta Oir Pnei Yehoshua, Rabbi Isaac

Eichenstein and Yosef Freund, Mendel was injured in an as yet undetermined amount, believed to

be not less than approximately Ten Million Dollars ($10, 000, 000.00), within the meaning of 18

U.S.C. § 1964(c).

**COUNT 4**
**VIOLATION OF 18 U.S.C. § 1962(C)**
**RELIGIOUS ENTERPRISE**

354) The Plaintiffs repeats and realleges paragraphs 1 through 353 as if fully set forth

herein.

355) This cause of action is asserted against all Defendants (the "Count 4 Defendants")

and is asserted in addition to and in the alternative to the 2nd and 3rd Counts.

356)        Section 1962(c) of Title 18 of the United States Code makes it illegal for

"any person employed by or associated with any enterprise engaged in, or the activities of which

affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the

conduct of such enterprise's affairs through a pattern of racketeering activity or collection of

unlawful debt."

357) At all relevant times, each of the Count 4 Defendants was and is a person within

the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

358) At all relevant times, Mendel and Sarah Paneth each was, and is, a person within

the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

359) Congregation Bnei Avrohom, Beis Din Beis Yoseph, Bais Din of Mechon

L'Hoyroa, Beth Din CRC, a/k/a Beit Din of Hisachdus and Congregation Galanta Oir Pnei

Yehoshua are religious entities, are pleaded herein together as Religious Association-in-Fact

Enterprise (**Religious Enterprise**) for the Count 4  Defendants has constituted an enterprise for the purposes of achieving unlawful results as complained in the foregoing paragraphs.

360)    Accordingly, at all relevant times, the Religious Enterprise was engaged in, and its activities affected, interstate commerce.

361)    At all relevant times, the conduct of the Count 4 Defendants and their co-conspirators has taken place in and has directly, substantially, and foreseeably affected and restrained interstate commerce.

362)    Each of the Count 4 Defendants conducted or participated in, directly or indirectly, the management or operation of the Enterprise and its affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C. § 1962(c); to wit, each has committed multiple predicate acts of racketeering activity within the meaning of 18 U.S.C. § 1961(1)(B)) including peonage and conspired with other Count 4 Defendants to commit and aid and abet other Count 4 Defendants' commission of the same, since at least 2014 and continuing to the present day as described above in detail, especially the following:

 (a) Multiple instances of mail fraud in violation of 18 U.S.C. § 1341;
(b) Multiple instances of wire fraud in violation of 18 U.S.C. § 1343;
(c) Multiple instances of subjecting Mendel Paneth to Peonage in violation of 18 U.S.C. § 1581;
(d) multiple instances of money laundry in violation of 18 U.S.C. 1956;
(e) Multiple instances of breaking into computers in violation of 18 U.S.C. § 1030;
(f) Multiple instances of Hobbs Act violation, 8 U.S.C. § 1951; and
(g) filing false claims in bankruptcy court in violation of 18 U.S.C. § 152

363)    The Count 4 Defendants' predicate acts of racketeering activity were all related in that they were all committed for the purpose of (1) advancing David Reiner interest, (2) keeping Mendel Paneth and Sarah Paneth in involuntary servitude and making them servile to the interest of David Reiner and continue to exploit them beside threatening with social ostracism.  These

acts, and others to be identified after further investigation and discovery herein, also shared a common or related result, participants, victim, and method of commission, which are described above.

364) Each of the defendants committed and aided and abetted the predicate acts described above in their official capacities as religious counselors, arbitrators or pleaders or as parties.

365) By reason of the violation of 18 U.S.C. § 1962(c) committed by Count 4 Defendants, Plaintiffs' business interests, income and property equity were injured in an as yet undetermined amount, believed to be not less than approximately Ten Million Dollars ($10, 000, 000.00), within the meaning of 18 U.S.C. § 1964(c).

## COUNT 5
## VIOLATION OF 18 U.S.C. § 1962(D) BY CONSPIRACY TO VIOLATE 18 U.S.C. § 1962(C)

366) Mendel Paneth and Sarah Paneth here repeat the allegations of paragraphs 1-365 of the Amended Complaint.

367) Plaintiffs are a "person" within the meaning of 18 U.S.C. § 1961(3) and 1964(c).

368) Defendants are each a "person" within the meaning of 18 U.S.C. § 1961(3) and 1964(c).

369) Kidline Enterprise Inc., Association in Fact Enterprise, Religious Enterprise, as pleaded above in addition and alternatively are an "enterprise" within the meaning of 18 U.S.C. § 1961(3) and 1964(c) which enterprise was engaged in and the activities of which affected interstate commerce during the relevant times.

370)   The Defendants are employed by or associated with the  enterprises as pleaded in the alternative, conspired within the meaning of 18 U.S.C. § 1962(d) to violate § 1962(c), that is, said

371)   Defendants  did conspire to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity within the meaning of  18 U.S.C. §§ 1961(1)(B) and 1961(E) and 1961(5) and 1581 and 1962(c), to wit:

> (a) Multiple instances of mail fraud in violation of 18 U.S.C. § 1341;
> (b) Multiple instances of wire fraud in violation of 18 U.S.C. § 1343;
> (c) Multiple instances of subjecting Mendel Paneth to Peonage in violation of 18 U.S.C. § 1581;
> (d) multiple instances of money laundry in violation of 18 U.S.C. 1956;
> (e) Multiple instances of breaking into computers in violation of 18 U.S.C. § 1030;
> (f) Multiple instances of Hobbs Act violation, 8 U.S.C. § 1951; and
> (g) filing false claims in bankruptcy court in violation of 18 U.S.C. § 152

372)   By reason of violation of 18 U.S.C. § 1962(d) committed by the Defendants, the plaintiffs were injured in an as yet undetermined amount, believed to be not less than approximately Ten Million Dollars within the meaning of 18 U.S.C. § 1964(c).

## OBJECTION TO PROOF OF CLAIM NUMBER 9 (DAVID REINER); CLAIM NO. 10 (KIDLINE ENTERPRISE INC AND CLAIM NO. 12 BY YOSEF FREUND (RECOUPMENT RELIEF AGAINST THE DEFENDANTS' PROOFS OF CLAIM)

373)   Mendel Paneth here repeats the allegations of paragraphs 1-372 of the Amended Complaint.

374)   This adversary proceeding by Mendel is also pursuant to 11 U.S.C. Sec. 502 and other laws to challenge the predatory and racketeering conduct of the Defendants and their unfair and deceptive acts and objects to the Proof of Claim (POC) filed by Defendant David Reiner, Kidline Enterprises Inc., and claim by Yosef Freund. It seeks remedy by way of recoupment, counterclaims to the filed Proof of Claim.

375)   Debtor plaintiff filed bankruptcy for freedom from peonage.

376)   The Defendants colluded with each other to saddle the Debtor with charges and excruciating covenants of onerous terms which were not enforceable in New York state and court but for the deception by Defendants as delineated in the foregoing paragraphs.

377)   The Plaintiffs have been greatly harmed, financially and emotionally by the unfair and deceptive actions of the said Defendants.

378)   Mendel  objects to the Proofs of Claim and requests that the Court disallow the claims in full for their acts as complained.

379)   Mendel's claims in this be deemed as counterclaim against the filed POCs, are brought in this action are brought in recoupment and right of setoff and Mendel asserts they form a basis for the disallowance in full or part of any and all claims of the filed POCs

380)   Mendel requests that the court liquidate the claims that he brings against the defendants and apply them to any and all claims of David Reiner, Kidline Enterprises, Inc and Yousef Freund thereby reducing its claim to a nullity and thereby disallowing the Proof of Claim.

381)   In addition, and in the alternative, Mendel objects to the filed POCs because the underlying  agreements, produced paperwork are procedurally and substantively unconscionable. Wherefore, Mendel is entitled to relief, d*isallowing way of counterclaims or recoupment or set off.*

382)   For all the foregoing reasons and causes of action and claims, the Plaintiffs makes the following,

## **PRAYER FOR RELIEF**

WHEREFORE, Mendel Paneth and Sarah Paneth pray for the following relief:

(a) That the Court declare, adjudge and decree that the complained of defendants has committed the violation[s] of Sherman Act Sections 1 and 2 alleged herein;

(b) That defendants and their  employees, agents, officers, directors, attorneys, successors, affiliates, subsidiaries and assigns, and all of those in active concert and participation with any of the foregoing persons or entities be enjoined and permanently from continuing to violate Sherman Act Sections 1 and 2 as described herein.

(c) That the Court award damages sustained by Mendel on the First Count in an amount to be determined at trial, trebled pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.

(d) Award cost of the suit including attorney's fees for the violation of Sherman Act.

(e) General and compensatory damages according to proof at trial for RICO violations;

(f) Treble damages pursuant to 18 U.S.C. §1965(c) for all RICO claims

(g) An award of Plaintiffs' reasonable attorneys' fees and costs and expenses pursuant to 18.U.S.C.  §1964(c)

(h) Punitive damages

(i) Recoupment or equitable relief in favor of the Plaintiff, nullifying the amount of the claims asserted by defendants David Reiner, Kidline Enterprises Inc and Yosef Freund.

(j) For injunctive relief against Defendants to prevent future wrongful conduct; and

(k) Such other and further relief as the Court deems just and proper

Pursuant to Federal Rules of Procedure 38( FRBP 9015), the Plaintiff Debtor demands a trial by jury in this action of all issues so triable.

Dated January 16, 2024                    DAHIYA LAW OFFICES, LLC
    New York, NY                          Attorneys for Plaintiffs,

                                  /s/*karamvir dahiya*
                                  By: Karamvir Dahiya

                                  Karamvir Dahiya, Esq.
                                  75 Maiden Lane Suite 606
                                  New York, NY 10038
                                  Telephone  212- 766-8000

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on January 16, 2023

_____
Mendel Paneth

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on January 16, 2023

_____
Sarah Paneth